# The Plymouth Railroad Company *versus* Colwell and Jacoby,

39 337
151 141
39 337
170 7

39 337
e39SC¹530

*Lands of Corporation, when Liable to Sale on Execution.—What Lands are Exempt.—Appropriation for Corporate Purposes, when to be made.*

1. Lands purchased by a railroad company beyond what are actually dedicated to corporate purposes, are bound by the lien of judgments against the corporation, and are liable to be levied in execution and sold by the sheriff as are the lands of any other debtor; but the purchaser at such sale takes only that which is not necessary for the full enjoyment and exercise of the corporate franchise, no matter how acquired by the corporation.

2. A canal basin is not a legitimate incident to a railroad having no authorized canal connection, and is not protected from levy and sale on execution against the company.

3. Where under their charter a railroad company could appropriate only four rods of ground in width, except at deep cuts and fillings, or at points selected for depots, or engine or water stations, and no locomotive road, as contemplated in the charter, was constructed within the five years limited therein for the completion, but a horse road only, ground cannot be thereafter appropriated for engine or water stations. That should have been done within the five years required by the act of incorporation.

Error to the Common Pleas of *Montgomery county.*

This was an action of ejectment, brought May 12th 1858, by the Plymouth Railroad Company against Stephen Colwell and Susanna Jacoby, for a lot of ground in the borough of Conshohocken (formerly Plymouth township), in the county of Montgomery, "containing about two acres of land, or thereabouts."

The case was tried on the issue formed by the usual plea of "not guilty," and resulted in a verdict and judgment for defendants; whereupon the plaintiff sued out this writ.

There were a number of errors assigned by the plaintiff in error, founded chiefly on bills of exception to the admission or rejection of evidence, none of which were considered material, except the ninth.

The case was argued here by *D. H. Mulvany,* for plaintiffs in error, and by *H. McMiller* and *James Boyd,* for defendants in error.

On the argument, there was a draft of the premises exhibited, which, with the description of the land claimed in writ, established the fact that the portion of it which the plaintiff sought to recover of Mr. Colwell, one of the defendants, was not embraced in their writ or declaration.

The material facts of the case, and the points raised by the counsel for the parties, are fully stated in the opinion of this court, which was delivered, June 5th 1861, by

3 Wr.—22

[Plymouth Railroad Co. *v.* Colwell and Jacoby.]

WOODWARD, J.—It was demonstrated on the argument, from the descriptions in title papers and from a draft of the premises, that the land for which Colwell took defence was not within the description of the plaintiff's writ. Of course they were not entitled to recover that for which they had not sued, and the verdict and judgment as to Colwell are unimpeachable.

But the defence of Mrs. Jacoby, as to her part of the premises, rests on another footing. To explicate it clearly from the confusion of an ill arranged paper-book, the leading facts of the case must be grouped together.

By an Act of Assembly of 18th March 1836, the plaintiffs were incorporated as a railroad company, to build a railroad apparently for the purpose of connecting the lime-kilns and farms of the interior of Montgomery county with the Philadelphia, Germantown, and Norristown Railroad. In April 1837, they bought a farm of Aaron Lukens of 40 acres and 104 perches, through which their road was to pass. They built a cheap railroad 3¾ miles long, suitable only for horse power, and have maintained it as such ever since. In 1841, they sold off to John Freedly and others, 38 acres and 130 perches of the Lukens farm, retaining only one acre and 134 perches—the premises now in dispute. In 1844, this retained lot was sold at sheriff's sale, on a judgment of Joseph Leedom against the company—the sale was set aside—and it was sold again on the same judgment to John Freedly for $950. The last levy and sale described the premises as "two acres more or less, on a part of which is the Plymouth Basin, and the Plymouth Railroad passes across said lot, subject to the corporate franchises of the said Plymouth Railroad Company over a part of said lot if any they have." Exceptions were filed to said sale on behalf of the company, on the ground that the premises were expressly reserved to the company for railroad purposes, and that they included the basin and grounds on which the road is located, and which are indispensable appurtenants of the road. The court overruled the exceptions, and confirmed the sale. On the 26th of November 1849, Freedly conveyed part of the premises to Colwell, and after Freedly's death, his executors, in 1853, conveyed the residue to Susanna Jacoby. The company claim the basin as a means of communicating with the Schuylkill Canal. It would seem there was a basin on the Lukens farm before the company bought, and that it was used as a deposit for logs to supply an adjacent saw-mill. After their purchase, the company deepened the basin so as to accommodate canalboats, which were brought in there to receive from the railroad, lime and other freights to be carried away by the Schuylkill Canal. The company insist on their right to retain the basin

[Plymouth Railroad Co. v. Colwell.]

for this purpose, and they claim the rest of the ground for the tracks of their road, for depots, engine-houses, &c.

What was the effect of the sheriff's sale on the company's title? They had very express authority by the incorporating law to buy, hold, mortgage, and sell lands; and in locating their road they probably found it expedient to buy the Lukens farm, rather than pay damages for crossing it. This is often the true policy of railroad companies. But lands so bought, and not actually dedicated to corporate purposes, are bound by the lien of judgments, and are liable to be levied in execution, and sold by the sheriff in the same manner and with the same effect as the lands of any other debtor. As to land which has been appropriated to corporate objects, and is necessary for the full enjoyment and exercise of any franchise of the company, whether acquired by purchase or by exercise of the delegated power of eminent domain, the company hold it entirely exempt from levy and sale; and this on no ground of prerogative or corporate immunity, for the company can no more alien or transfer such land by their own act than can a creditor by legal process; but the exemption rests on the public interests involved in the corporation. Though the corporation in respect to its capital is private, yet it was created to accomplish objects in which the public have a direct interest, and its authority to hold lands was conferred that these objects might be worked out. They shall not be balked, therefore, by either the act of the company itself or of its creditors. For the sake of the public, whatever is essential to the corporate functions shall be retained by the corporation. The only remedy which the law allows to creditors against property so held is sequestration: 9 W. & S. 28. And that remedy is consistent with corporate existence, whilst a power to alien, or liability to levy and sale on execution, would hang the existence of the corporation on the caprices of the managers or on the mercy of its creditors. For, the corporation would cease to exist for the purposes of its institution, when its means of subsistence were gone. It might still have a name to live, but it would be only a life in name. A railroad company could scarcely accomplish the end of its being, after the ground on which its rails rest had been sold to a stranger. If such is in general the law of corporate tenures which are essential to corporate functions, it is peculiarly the law of this case where Freedly took his title from the sheriff, expressly subject to the franchises of the Plymouth Railroad Company.

Then what are the franchises of this company? Do they include a right to the basin for purposes of navigation?

The company were authorized to build a railroad, with as many sets of tracks as they may deem necessary, from a point in the lands of Samuel Maulsby, in the township of Whitemarsh,

in the county of Montgomery, near the road dividing the townships of Whitemarsh and Plymouth, east of said road, "*and terminating at some suitable point of the Philadelphia, Germantown, and Norristown Railroad, between Metser's ford and Wager's ford, on the river Schuylkill, in said township of Plymouth.*"

The reference to the river Schuylkill and the fords thereof, was for the purpose of fixing, with approximate certainty, the point *ad quem* the railroad was to be built; but its actual terminus was to be on the Philadelphia and Norristown Railroad. A connection with that road was intended, but not with the Schuylkill Canal. The improvement contemplated was a transportation by connecting railroads, and not by a railroad and canal. There is not a word in the law of incorporation which imports an intention to create a navigation company. Then what has the company to do with canal-basins and canal-boats? It is not pertinent to urge that their road would be more profitably worked in connection with the canal than with the railroad. Their corporate powers are to be measured by a strict construction of the legislative grant. If they possess the right claimed, it must be found in the powers specifically granted, or it must result as a necessary implication from the express grants, and if it can neither be found in nor inferred from the terms of the grant, it does not exist. Authority granted to terminate a road on the Philadelphia and Norristown Railroad, cannot be construed an authority to terminate it in the Schuylklil Canal. And it follows as a necessary consequence, that a canal-basin is not a legitimate incident of a railroad having no authorized canal connection. Neither, therefore, under the general principles of law, nor the particular qualification expressed in the sheriff's deed to Freedly, was this basin held as an appurtenant of the railroad, and hence a valid title passed by the sheriff's sale to Freedly, and through him to Mrs. Jacoby.

But the whole lot was sold, and included the very bed of the road, as well as the ground that was needed for a depot and other buildings. As to such portions of the lot as were occupied or appropriated for these purposes, no title passed to Freedly, and none, of course, vested in Mrs. Jacoby. Yet she having taken defence for the whole, the verdict ought to have distinguished what was lawfully appurtenant to the road, and what was not. The company must be protected in the possession of all that is really essential to the enjoyment of their franchise.

Their charter authorizes them to appropriate four rods in width, and limits them to that, except in deep cuts and fillings, or at points selected for depots, or engine or water stations. It evidently contemplated a locomotive road, and it gave them five years to complete it, "according to the true intent and meaning

[Plymouth Railroad Co. *v.* Colwell and Jacoby.]

of this act." In ascertaining the necessary appurtenances of the road, regard is to be had to this limitation of time, for the appropriations of ground were to be all made within that time. The road was to stand complete at the end of five years—not that all necessary tracks and buildings, which increasing business should require to be added to the first construction, should have been erected in that time, but that the ground for all such additions should have been appropriated, and one track at least finished.

If the fact be that a locomotive road has not yet been constructed, it is too late to appropriate ground for engine and water stations; that should have been done within the five years. And, indeed, it would be hard for the company to maintain the track of a horse road under such a law as they have, if they were proceeded against by the Commonwealth. But we will not allow them to be ousted from the ground they actually occupy by an intruder, with merely colour of title; nor is a forfeiture of chartered privileges to be declared in this collateral action. They are entitled to retain and enjoy the ground they occupy, and which they appropriated for the lawful purposes of the road within five years from the date of the charter. But no alleged appropriation for engine-houses and water stations ought to be respected, if it was followed by no *bonâ fide* effort to build a locomotive road, according to the plain intent of the charter. Without such a road, an appropriation of that sort would be useless, if not fraudulent.

These seem to us to be the principles on which this cause ought to have been decided. Most of them were observed by the learned judge in his rulings; but what portion of the ground had become appurtenant to the road by appropriation such as we have described, was a question of fact which ought to have been submitted to the jury. And there was some evidence on the point in the admitted portions of Carson's depositions. If there ever was any appropriation made by stakes or fences, or other acts on the ground, the company ought to be able to show it by the most irrefragable proof.

The assignments of error, founded on bills of exception to evidence, were apparently made in studious disregard of the rules prescribed in 6 Harris 568, especially Rule viii.; but still, we have gone through them as well as we could, and neither in them nor in the answers to the points propounded, do we see any other ground for reversing the judgment than the failure to submit to the jury the question how much of the ground in dispute the company had actually appropriated to the lawful purposes of their corporation.

> The judgment is reversed, and a *venire facias de novo* is awarded as to Susanna Jacoby, and judgment affirmed as to Stephen Colwell.