## WESTERN UNION TEL. CO. v. PENNSYLVANIA R. CO. (two cases).

### (Circuit Court, W. D. Pennsylvania. January 15, 1903.)

### Nos. 3, 18.

1. EMINENT DOMAIN—REAPPROPRIATION OF PART OF RAILROAD RIGHT OF WAY.

The question of the future needs of a railroad in fulfilling its chartered purpose and performing its public·duty as a common carrier is one which should be given full consideration by a court before it undertakes to deprive the railroad company of any part of its right of way in condemnation proceedings instituted by another corporation.

2. SAME—PROCEEDINGS BY TELEGRAPH COMPANY.

A telegraph company, which for a term of years has maintained its lines on the right of way of a railroad under a contract by which it paid rental, and expressly covenanted to remove its lines and surrender possession at the end of the term, acquired no rights or equities by reason of its tenancy which give support to a subsequent petition seeking to condemn the demised premises under the power of eminent domain.

3. TELEGRAPH COMPANIES—CONTRACT FOR RIGHT OF WAY—VALIDITY.

The provision of the constitution of Pennsylvania (article 16, § 12) that "no telegraph company shall * * * acquire, by purchase or otherwise, any other competing line of telegraph," has no application to a contract between a telegraph and a railroad company by which the latter is to supply the telegraph company with pole facilities for its wires on the railroad right of way, the intention being to substitute the lines of such company for those of another company whose lease with the railroad company had expired.

4. SAME—RIGHT OF EMINENT DOMAIN—FEDERAL STATUTE.

Act July 24, 1866, embodied in substance in Rev. St. §§ 5263, 5264 [U. S. Comp. St. 1901, pp. 3579, 3580], which authorizes any telegraph company to construct, maintain, and operate its lines over any portion of the public domain, and over and along any military or post road of the United States, confers an interstate franchise, but does not confer upon telegraph companies the right to exercise the power of eminent domain to condemn right of way over private property.

5. SAME—CONSTRUCTION OF CHARTER—IMPLIED POWERS.

When the express powers conferred upon a telegraph company by its charter, granted by a legislative act, are sufficient to effect the charter object, no power can be implied therefrom to condemn for the use of the company property already actually held and used for another public use. By the general rule, which is also established by decision as the rule in Pennsylvania, property devoted to one public use cannot be taken for another without legislative authority expressed in clear terms or by necessary implication.

6. SAME—PENNSYLVANIA STATUTE.

Act Pa. March 24, 1849, chartering the Atlantic & Ohio Telegraph Company, and authorizing it to construct and maintain telegraph lines by one or more routes between the cities of Philadelphia and Pittsburg and intermediate places, and "to erect and construct works, edifices, fixtures, and structures along and across any of the roads, highways, streets, and waters within the state, the said works to be so placed as not to interfere with the common use of said roads, highways, streets, and waters," was a grant of right of way along and over such roads, etc., which, under the Pennsylvania decisions, are the property of the state; but did not confer upon the corporation, either expressly· or by implication, the right to appropriate, by the exercise of the power of eminent domain, right of way for its line over the right of way of a railroad.

**7.** **SAME—OCCUPANCY OF RIGHT OF WAY UNDER LEASE—ESTOPPEL TO DENY LANDLORD'S TITLE.**

A telegraph company, which for more than 20 years has occupied and used by its lines a part of the right of way of a railroad under a lease, and during such time has paid rental monthly, so long as it continues such occupancy is estopped by the relation of landlord and tenant to deny the title of the railroad company, or its right to re-enter and take possession of the ground so occupied after the lease has been terminated in accordance with its terms, on the ground that when the lease was made the telegraph company was already in possession under the right of a third party, paramount to that of the railroad company, which it had no power to release.

**8.** **PARTIES—CORPORATIONS—SUIT TO DETERMINE RIGHTS UNDER CONTRACT.**

A telegraph company, which is using all the lines, property, and franchises of another company under a lease terminable on notice at the will of either party, cannot maintain a suit in equity to determine the rights of its lessor under a contract between it and a railroad company without making such lessor a party; nor is the rule different because complainant may own all or a majority of the stock of its lessor.

**9.** **PRELIMINARY INJUNCTION—PROTECTION OF TITLE—SUFFICIENCY OF ALLEGATIONS.**

Under the rule that, where the right to an injunction depends upon title, such title must be clearly shown, a court of equity will not grant a preliminary injunction to restrain a railroad company from re-entering and taking possession of a portion of its right of way occupied by a telegraph line under a lease which has been terminated, on the ground that an absolute title to the telegraphic right of way was vested in a telegraph company by a contract made prior to the lease, where it is shown by the plaintiff's bill that defendant has been in open possession of such telegraphic right of way, through its tenant for more than 21 years, which, under the law of the state, would give it title by adverse possession.

**10.** **LANDLORD AND TENANT—NOTICE TO QUIT—WAIVER.**

A valid notice terminating a lease given by a landlord or tenant cannot be withdrawn except by consent of both parties which amounts to a new agreement and creates a new tenancy, and the acceptance of rent by a landlord after the giving of a notice to quit is not in itself a waiver of such notice, but is merely evidence to be considered with all the other facts of the case.

**11.** **SAME—EVIDENCE CONSIDERED.**

Pursuant to the action of its board of directors, a railroad company served notice on the telegraph company of the termination of a lease under which the latter company had maintained its lines on the right of way of the railroad. By the terms of the lease the telegraph company had six months after the notice within which to remove its poles and wires, and during such time the payment of rent by such company and the payment by the railroad company for telegraphic service were mutually waived. After the notice, one or two monthly payments of rent were made in the usual course by the treasurer of the telegraph company, and accepted by the treasurer of the railroad company. The correspondence between the parties with respect to the termination of the lease was carried on between the presidents of the two companies, and continued for some months. It did not appear that either knew of the rent payments, but it did appear from the letters of the president of the railroad company that he was at all times standing on the notice to quit, and that such fact was recognized by the other company. *Held*, that the acceptance of such rent, and the failure to return it,—the telegraph company in the meantime having continued to operate its lines,— did not constitute a waiver on the part of the railroad company of the right to insist on the termination of the lease, which entitled the telegraph company to an injunction restraining it from re-entering and taking possession of the right of way at the expiration of the six months, it not being shown that its treasurer had any power to make such waiver, even if such had been his intention.

Proceeding at Law to Condemn Right of Way and Suit in Equity for Injunction. Heard together on petition in the former case, and on motion in the latter for a preliminary injunction.

A. M. Neeper, Rush Taggart, and Henry D. Estabrook, for plaintiff.

Patterson, Sterrett & Acheson and John G. Johnson, for defendant.

BUFFINGTON, District Judge. This opinion concerns two cases brought in this court by the Western Union Telegraph Company against the Pennsylvania Railroad Company,—one, a petition on the law side to condemn part of the railroad's right of way, and appropriate it to telegraph purposes; the other, a bill on the equity side, praying for an injunction to restrain the railroad from dispossessing the telegraph company during the pendency of said condemnation proceedings. Briefly summarized, the relations of the parties are as follows: The Atlantic & Ohio Telegraph Company is a corporation chartered by the state of Pennsylvania. On June 20, 1864, it entered into a contract with the Pennsylvania Railroad Company, whereby the latter granted permission to the telegraph company to place a telegraph line on the railroad's right of way. On April 15, 1864, the Atlantic & Ohio Telegraph Company had leased to the Western Union Telegraph Company, a corporation of the state of New York, all its property for 10 years, the lease to be terminated after that time by either party on 6 months' notice. Thereafter the Western Union Telegraph Company operated the Atlantic & Ohio's telegraph lines on the railroad right of way. On September 20, 1881, the Western Union Telegraph Company and the Pennsylvania Railroad Company entered into a new contract covering this telegraph line. This contract was for 20 years, at the end of which time it could be terminated by the railroad on 6 months' notice. On May 15, 1902, the railroad gave the telegraph company notice of the termination of the lease, and to remove its lines on December 1, 1902. On November 26, 1902, the Western Union Telegraph Company brought its petition and bill in equity in this court as noted above. As the two are interrelated, we will dispose of the questions arising under each in one opinion, which may be considered as filed in each case.

We first take up the petition. By it the Western Union Telegraph Company seeks to condemn and appropriate to its use for telegraph purposes a strip of ground located on the right of way of the Pennsylvania Railroad from Pittsburg to Philadelphia, and upon numerous branches or connecting side lines as well. The total appropriation thus sought, indicated by an accompanying map, covers upwards of 1,500 miles of railroad right of way. The petition prays that this court approve a tendered bond in the sum of $100,000, and order the same to be filed "for the use and benefit of the Pennsylvania Railroad Company in its own behalf, and as the owner, lessee, or operator of the railroads over whose properties the rights of way sought to be appropriated by the Western Union Telegraph extend"; that proceedings be had to determine the compensation to be paid; that upon payment of said sum into court or to the railroad possession be adjudged of

said "use, rights, and interests"; and that "the title to the said rights and interests, as against the defendant, thereby vest in the said Western Union Telegraph Company." An examination of the prayers of this petition in connection with the resolutions of the Atlantic & Ohio Telegraph Company and those of the Western Union Telegraph Company, its lessee, and in pursuance of which resolutions this proceeding is begun, shows that what is here sought to be appropriated is the ownership of and title to a part of the ground constituting the general right of way of the railroad company. It is true there is in the resolutions a clause stating that what is appropriated shall be "subject to such reasonable changes of location of said poles, at the direction of said railroad company, from time to time hereafter, as may be necessary to prevent said telegraph line from interfering with the ordinary use and travel upon said railways." We find no statutory provision or limitation for a condemnation of land which subjects it to such shifting and transient ownership and occupation as above suggested. If the petitioner is entitled to condemn and appropriate, it would seem it is entitled to have and to hold what it acquires and pays for. But it is, in any view, clear that this clause, if enforceable, would only permit the railroad to shift upon, but never remove from, its right of way, the telegraph lines of the appropriating company. If the railroad's future needs should demand the occupation hereafter of the whole of its present right of way for additional tracks, or if its own telegraphic necessities required it to duplicate on the north side the private telegraph lines it now has on the south side of its right of way, it is evident that it could not exclude from such north side, or at all events from its right of way generally, a telegraph company that had condemned and acquired what is here sought. Whether, then, the land appropriated be a definite, fixed line, or a shifting strip, subject to relocation by the railroad, it is certain it is some part of the railroad's right of way, and that to such part the telegraph company could acquire exclusive, adverse ownership. Indeed, as we have seen, this is the object sought, viz., that "the title to said rights and interests, as against the defendant, thereby vest in the said Western Union Telegraph Company"; and that a fixed location is, in effect, sought under this proceeding, is shown in the prayer of the bill in equity for a permanent injunction: "That, upon due payment of said compensation by your orator to the defendant, this court will order, adjudge, and decree that your orator is entitled to a perpetual injunction against the defendant herein restraining it from in any manner interfering with the location, construction, maintenance, and operation of your orator's said lines of telegraph upon the roadway or right of way of the said defendant." Under any view, as to the part so taken and occupied, even for the time being, by the petitioner's poles, the railroad is excluded from the use thereof for its tracks, for its own telegraph lines, and for the lines of other telegraph companies, whose tenancies might be highly remunerative and desirable, or whose facilities would substantially aid in the transaction of the railroad's business. This question of the future needs of the railroad, its unhampered control and sole use of its right of way to enable it to fully perform its public duty of a common carrier, is

one of grave importance. A railroad's right of way is the artery of its life; its acquisition and construction difficult and costly; the extent to which it can be used for additional track room the limit of the railroad's development. In taking from it any part of such ground, due regard should, therefore, be had to its future needs. It was well said by Judge McKennan in a case in this court, later referred to:

"Every reasonable intendment must be made in favor of the primary rights of the complainant [in this case, the case of a railroad seeking to prevent part of its right of way being reappropriated]. * * * No actual encroachment upon these rights can be sanctioned or allowed; and in measuring their extent there must be a liberal consideration of the future as well as the present necessities of the complainant, touching the use of the existing tracks, the construction of additional ones, the convenient storage of its freight at all seasons, and the unembarrassed transaction of all its freight business."

We deem the question therein mentioned as to the future needs of a railroad in fulfilling its chartered purpose such as should receive thoughtful regard and due consideration before it is deprived of any part of its right of way.

Now, whatever the scope of the appropriation sought, and however the ownership thereof may be possibly qualified under the clause relating to relocation, it is clear that what is sought is an adverse, in invitum appropriation covering many hundred miles of railroad property, and that "the title to said rights and interests, as against the defendant, thereby vest in the said Western Union Telegraph Company." Indeed, the absolute and exclusive character of telegraph appropriation, with reference to a street,—and the same may be said, mutatis mutandis, to the occupation of a railroad,—is stated by the supreme court of the United States in City of St. Louis v. Western Union Tel. Co., 148 U. S. 92, 13 Sup. Ct. 485, 37 L. Ed. 380:

"But the use made by the telegraph company is, in respect to so much of the space as it occupies with its poles, permanent and exclusive. It as effectually and permanently dispossesses the general public as if it had destroyed that amount of ground. Whatever benefit the public may receive in the way of transportations of messages, that space is, as far as respects its actual use for purposes of a highway and personal travel, wholly lost to the public. By sufficient multiplication of telegraph and telephone companies the whole space of the highway might be occupied, and that which was designed for general use for purposes of travel entirely appropriated to the separate use of companies for the transportation of messages."

The present question of the filing and approval of the bond tendered is, on the surface, of seemingly small import, and might be regarded as a formal preliminary step in a legal contest. In reality, under the Pennsylvania decisions, as applicable to the facts of this case, approval by the court of the bond vests in the appropriating company as clear and perfect a title to the easement sought as though it had been bought and paid for. As was said in Appeal of Hoffman, 118 Pa. 512, 12 Atl. 57:

"The privilege of taking private property for public use may, therefore, be constitutionally exercised by those invested therewith in one of two ways, —either by actual payment, or by giving security for the payment of compensation to the owner of the property taken. For example, if a railroad company agrees with and pays to the landowner for right of way, it thereby acquires a clear right to the easement. On the other hand, if the parties fail to agree,

the same right may be acquired by complying with the other constitutional alternative, viz., giving security for the payment of just compensation in the manner prescribed by law. When the latter alternative is resorted to, and sufficient bond, with sureties approved by the court, has been given, the company acquires as clear and perfect right to the easement as if it had paid therefor in cash."

The approval of this bond being, then, a decree which adjudges the right of the petitioner to take and the duty of the railroad to surrender, and being, in substance, a compulsory judicial conveyance to the telegraph company of title to property which may prove indispensable to the future needs of the present railroad owner, the duty—indeed, the obligation—resting upon a court to be well assured of its right so to do before taking such a far-reaching and irretrievable step is apparent.

Now, the land here sought to be appropriated is to be regarded in two different relations,—one public, the other private; for, while it is private in ownership, it is public in use and duty. As constituting a part of a railroad right of way, it is by federal as well as state law and decision deemed a public highway, and as such dedicated or set apart to a public use. Const. of Pa. art. 17, § 1, says, "All railroads and canals shall be public highways, and all railroad and canal companies shall be common carriers;" and by the act of congress of June 8, 1872 (17 Stat. 308, § 201), it is provided "that all railways and parts of railways which are now or may hereafter be put in operation are hereby declared to be post roads." "The question," says the supreme court of the United States (Cherokee Nation v. Southern Kan. R. Co., 135 U. S. 657, 10 Sup. Ct. 971, 34 L. Ed. 295, "is no longer an open one as to whether a railroad is a public highway established primarily for the convenience of the people, and to subserve public ends." But not only is a railroad made a public highway, but under the laws of Pennsylvania land of a railroad or other corporation, necessary to the full enjoyment and exercise of a public use, is, by virtue of being dedicated to such use, excepted from some of the liabilities incident to private property, in being exempt from levy and sale and incapable of corporate alienation, unless such power of alienation is conferred by the state. This "exemption," as is said in Railroad Co. v. Colwell, 39 Pa. 339, 80 Am. Dec. 526, "rests on the public interests involved in the corporation. Though the corporation, in respect to its capital, is private, yet it was created to accomplish objects in which the public have a direct interest, and its authority to hold land was conferred that these objects might be worked out." Such limitation exists not by reason of corporate ownership (Twelfth St. Market Co. v. Philadelphia & R. T. R. Co., 142 Pa. 580, 21 Atl. 902, 989), but because of the public right to the public use, which ordinarily cannot be gainsaid or withdrawn by the owner.

But while the use to which such property is subjected is public, yet ownership thereof remains private. Thus Mr. Justice Grier, in Rundle v. Canal Co., 1 Wall. Jr. 275, 21 Fed. Cas. p. 11 (No. 12,139) says:

"In the popular meaning of the term nearly every corporation is public, inasmuch as they are all created for the public benefit. Yet if the whole interest does not belong to the government, or if the corporation is not created

for the administration of political or municipal power, it is a private corporation. Thus all bank, bridge, turnpike, railroad, and canal companies are private corporations. In these and other similar cases the uses may in a certain sense be called public, but the corporations are private, as much so as if the franchises were vested in a single person. Dartmouth College v. Woodward, 4 Wheat. 669, 4 L. Ed. 629."

Freem. Ex'ns, § 126a, says:

"The property of certain quasi public corporations is held by them for the purpose of private gain, and has, so far as its ownership is concerned, all the advantages of private property."

Seeing, then, that what is here sought to be appropriated is not only private property, and of great value to its private owners, but that it is impressed with a federal obligation and public use as a federal post road, and with a state one as a highway and a common carrier, it is evident that the right of the petitioner to devest private ownership and divert public use must be clear and free from uncertainty. Such right the petitioner claims to have by virtue of a power of eminent domain in it vested, first by the act of congress of July 24, 1866, and, secondly, by the constitution and statutes of Pennsylvania. Whether such powers and rights are so vested constitutes the underlying question of this case; but, before considering it, we deem it proper, so far as concerns the petition to condemn, to refer to and dispose of some other phases of this controversy.

At the argument it was contended on behalf of the railroad, inter alia, that such right of eminent domain as a telegraph company could exercise in Pennsylvania was confined to corporations chartered by that state; that whatever right was exercised in the present case could be exercisable only by the Atlantic & Ohio Telegraph Company, a Pennsylvania corporation, the lessor of the Western Union Telegraph Company; that the former company was a necessary but non-joined party in the petition, and that, if made a party therein, the jurisdiction of this court would be ousted; that the Pennsylvania Railroad Company, having its principal office and being located in the Eastern district of Pennsylvania, could not be sued in this case in the Western district; that the present application to file and approve the bond was not a suit or action of law of which this court has jurisdiction; and that the right of eminent domain could only be exercised after a bond had been filed and approved in the state court in accordance with the Pennsylvania statutes. It is obvious, however, that, unless the right of eminent domain is vested in the petitioner, it will not be necessary to pass upon these and other questions involved. We will, therefore, for present purposes, assume, without deciding, that all these questions are with the petitioning company, and address ourselves to those of alleged federal and state rights of eminent domain.

It is also proper to here remark that this proceeding to condemn is in no wise affected by the past or present relations between the Western Union Telegraph Company and the Pennsylvania Railroad Company. By the contract of September 20, 1881, noted above, the Pennsylvania Railroad Company granted to the Western Union Telegraph Company the "right to place, maintain, and use upon the line of the right of way of the Pennsylvania Railroad and of the

railroads owned, operated, or leased by it,   *   *   *   a single line of telegraph poles,   *   *   *   with the privilege of erecting and maintaining thereon such number of wires as the telegraph company may from time to time elect, said line to be located and placed under the direction of the general manager of the railroad company." It provided for the payment of an annual rental by the telegraph company. It was "to continue in force for and during the term of twenty years" from its date; that the telegraph company should, "at the termination of this contract, or at any time thereafter, upon receiving written notice from the railroad company, remove within six months from the receipt of said notice all of its poles and wires, and, if not so removed, the railroad company may remove them at the expense of the telegraph company." It also provided that "any easement or right of way heretofore acquired by the telegraph company upon any of the roads embraced in this agreement, either directly by contract or by assignment of contracts or agreements made by other companies with the railroad company, or with any of the companies whose roads or property are embraced in the schedule hereto attached, is hereby relinquished and abandoned, and the rights and easements of the telegraph company upon the right of way of said railway company shall be such only as are granted by this agreement, and shall cease with its termination."

Now, whatever may have been the prior rights of the Western Union Company, which, as noted above, it expressly surrendered, it is clear its possession of the railroad property when this petition was filed, was under the contract of September 20, 1881. That contract created a rental relation. As stated in City of St. Louis v. Western Union Tel. Co., supra, it was "in the nature of a charge for the use of the property;   *   *   *   that which may properly be called 'rental.'" Having entered into the contract of tenancy, and its possession of the locus in quo being under an expressed covenant and an implied obligation to surrender at the termination of the tenancy, it is clear, as shown later in this opinion, that the tenant can avail itself of no pre-existing adverse rights to defeat the owner's dominant title. Nor can any rights enjoyed by the tenant under the lease and pursuant thereto be made a ground for denying the landlord the implied and covenanted right to have possession yielded, and his dominant estate restored. In view, therefore, of the tenancy of the Western Union Telegraph Company under this contract, of the well-recognized legal duty and "implied obligation on the part of the tenant to redeliver the possession of the demised premises to his landlord upon the expiration of his term," (18 Am. & Eng. Enc. Law [2d Ed.] p. 403), and of the express provisions for surrender, the petition of the tenant, the Western Union Telegraph Company, to appropriate by eminent domain the property of its railroad landlord, should be treated as one wholly independent of the question of tenancy. If it be vested with the right of eminent domain, that right is neither dependent upon, increased by, nor detracted from by its tenancy. In other words, while the right of the telegraph company to begin, during the tenancy, a proceeding to condemn the demised premises, may, for present purposes, be assumed, it is equally ob-

120 F.—24

vious that such proceeding must stand wholly on the right to condemn, and that no rights or equities to such adverse proceedings can be based on the servient contract relation of tenancy under which the petitioner is in possession. The right, therefore, of this petitioner to appropriate by eminent domain will be considered precisely as in the case of any third corporation vested with the petitioner's corporate rights, seeking like relief. It is obvious, also, the suggestion that some permanent right was vested in the Atlantic & Ohio Telegraph Company under the prior contract does not affect this petition to condemn. The resolution of that company approving the resolutions of the Western Union Telegraph Company to appropriate by condemnation this right of way is based upon the implied assumption of ownership by the railroad of the property so sought to be appropriated. It is a resolution to acquire by virtue of the public right of eminent domain; not to enforce or suggest any private right or claim. It is obvious, therefore, that the averment of possible right in the Atlantic & Ohio Telegraph Company has no pertinency to this petition.

Another preliminary matter should be referred to. The Pennsylvania Railroad Company, prior to the beginning of this proceeding, entered into a contract with the Postal Telegraph Cable Company, dated June 25, 1902, whereby the railroad in substance agreed, in consideration of certain rentals, to furnish that company with pole facilities upon its rights of way for 15 years, and permit the telegraph company to use the same for its wires. Inasmuch as the private telegraph lines of the railroad now occupy the south side of its right of way, and to furnish the pole facilities provided for in this contract the railroad intends to place poles owned by itself on the north side, and occupy the location now used by the Western Union Telegraph Company, it is contended the contract in question violates article 16, § 12, of the constitution of Pennsylvania, which provides: "No telegraph company shall consolidate with, or hold a controlling interest in, the stock or bonds of any other telegraph company owning a competing line or acquire, by purchase or otherwise, any other competing line of telegraph." This clause has no reference to this case. Certain it is, by this contract the Postal Telegraph Cable Company did none of the acts thereby inhibited. It has not consolidated with the petitioning company; it has no proven controlling interest in its stock or bonds; nor has it acquired, by purchase or otherwise, any competing line. It further appears the railroad company notified the Western Union Telegraph Company to remove all of its poles, wires, and property from its right of way, so that neither directly nor indirectly is it proposed that the Postal Telegraph Cable Company shall, in the fulfillment of this contract, "acquire, by purchase or otherwise, any other competing line of telegraph." Moreover, it is apparent that the validity or nonvalidity of such contract can in no wise affect the question whether prior legislation vests the right of eminent domain in this petitioner.

Turning, then, to the underlying question, let us ascertain what powers of eminent domain, state or federal, are vested in the petitioning company. Eminent domain is one of the highest attributes of

sovereignty. By it the sovereign power, state or federal, is enabled to take private property and appropriate it to public use. But, subject to this sovereign power, private ownership is absolute, and such absolute ownership is safeguarded by a twofold constitutional protection, viz., it can only be taken away by due process of law, and then on payment of just compensation. Amendment 5 of the constitution of the United States provides: "No person shall * * * be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation." It is also true that the sovereign state or nation can, by virtue of its superior dominion or eminent domain, reappropriate to an additional or secondary public use property it has once set apart to public use; for it must be apparent that the sovereign power cannot, by dedicating property to one use, preclude itself from rededicating the same property to some other public need. To do so were to defeat the purpose for which alone sovereignty exists,—to promote the public good. "Salus populi est suprema lex." It will, therefore, be apparent that the federal government, in promoting federal constitutional powers, and the state in its sphere, have the sovereign right to appropriate private property to public use, and to reappropriate property once set apart to public uses to other and additional ones.

Now, as a telegraph line is a recognized factor of commerce (Pensacola Tel. Co. v. Western Union Tel. Co., 96 U. S. 1, 24 L. Ed. 708), and therefore a public use, the right of the nation and state to exercise the power of eminent domain to appropriate property for telegraph purposes is clear. But while the right is undoubted, its enforcement affects the otherwise absolute right of private property, protected, as we have seen, by constitutional safeguards. The right to take, in invitum, the property of the subject, is the most absolute power of sovereignty,—the surrender of ownership, the abridgment of fundamental and constitutional right. It is manifest, therefore, that one who claims a delegated right to exercise this sovereign power must show a clear right, and that whatever is not expressly given, or ex necessitate implied, must be deemed withheld. And where not only private property, but public uses, are affected, the right to appropriate should be certain in that regard. Inhabitants of Springfield v. Connecticut R. R. Co., 4 Cush. 73; In re City of Buffalo, 68 N. Y. 171; In re Boston & A. R. Co., 53 N. Y. 577.

Let us then inquire whether congress has delegated the power of eminent domain by the act of July 24, 1866. Section 1 of that act (14 Stat. 221), now embodied, though not in exact words, in sections 5263 and 5264 of the Revised Statutes [U. S. Comp. St. 1901, pp. 3579, 3580], enacts:

"That any telegraph company now organized, or which may hereafter be organized under the laws of any state in this Union, shall have the right to construct, maintain and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which have been or may hereafter be declared such by act of congress, and over, under or across the navigable streams or waters of the United States: provided, that such lines of telegraph shall be so constructed and maintained as not to obstruct the

navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads. And any of said companies shall have the right to take and use from such public lands the necessary stone, timber and other materials for its posts, piers, stations and other needful uses in the construction, maintenance and operation of said lines of telegraph, and may pre-empt and use such portion of the unoccupied public lands subject to pre-emption through which its said lines of telegraph may be located as may be necessary for its stations, not exceeding forty acres for each station; but such stations shall not be within fifteen miles of each other."

The declared object of this act is "to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military and other purposes." These expressed purposes are fulfilled by the act even if the right of eminent domain is not delegated. The statute was passed at a time when transcontinental rail and telegraph lines through the public domain were in construction or contemplation. No special ground calling for legislation so far as existing lines of railroad were concerned is shown to have then existed. Indeed, the record in this case shows that both prior thereto and since, railroad companies were contracting with telegraph companies in order to secure the installation of telegraphs along their lines as a help to railroad operation. Material property, and aid by the way of privilege, were given by the government in the right to "construct, maintain and operate lines of telegraph through and over any portion of the public domain of the United States," and "over, under or across the navigable streams or waters of the United States"; in the free right to use necessary stone, timber, or other materials from the public land, and to pre-empt 40 acres of land for each station. An interstate franchise, free from state interference, was conferred in the right "to construct, maintain and operate lines of telegraph * * * over and along any of the military or post roads of the United States, which may have been or may hereafter be declared such by act of congress." Pensacola Tel. Co. v. Western Union Tel. Co., supra. It will, therefore, be seen that in these substantial and valuable property and franchise rights the expressed purposes of the act were fulfilled, and there is no necessity to superadd the right of eminent domain. Such grant is not essential to the enjoyment of the franchise conferred. Moreover, since the constitutional inhibition to which reference has been made provides that "no person shall * * * be deprived of * * * property without due process of law, nor shall private property be taken for public use without just compensation," thus coupling the right to take by "due process of law" with the tender of just compensation, it would seem that, if congress intended by this act to empower the taking of private property, it would have made provisions for ascertaining compensation. In the absence of any imperative demand for an implied grant of the right of eminent domain, the omission of provision for compensation is an argumentative, if not, indeed, a cogent, reason for concluding that no grant of the right to take private property was contemplated. Provision for compensation may imply power to take. Linton v. Bridge Co., 1 Grant, Cas. 415. Absence thereof suggests no power to take was intended. Chamberlain v. Cordage Co., 41 N. J. Eq. 43, 2 Atl. 775. Moreover, the express grant of

public, and the nonreference to private, property is pregnant proof that private property rights were not meant to be affected. Mention of the one was exclusion of the other. In Murphy v. Railway Co., 11 Ont. 582, it was held that St. 46 Vict. c. 64 (D), which empowered a railroad company "to own and hold land in any municipality through or in which the main line or any branch was carried, for the erection and maintenance thereon of stations, sidings, etc., as might be necessary for the purpose of the company," did not empower them to expropriate against the will of the owner.

There being no express grant of the right of eminent domain in this act, it is clear there is no implied one. The grant, outside of federal property, was, as we have seen, "to construct, maintain and operate lines of telegraph * * * over and along any of the military or post roads of the United States, which have been or may hereafter be declared such by the act of congress." While it is true that a right to condemn may be implied of necessity when the grant itself would be defeated unless such power were implied, yet such necessity is one arising not from the act of the party seeking to avail himself of the right, but from the law itself. It is one proceeding from the nature of things over which the party has no control, and not from mere convenience or economy. Lewis, Em. Dom. § 240. Now, the conformation of a country in the way of defiles, rock formation, and streams might be such that two authorized roads—rail, highway or turnpike—would be physically required to use in common a sole permissible grade and location, or to be compelled to make an unreasonable detour. But grade is not a necessary factor in telegraph construction. There is no physical reason why a telegraph company cannot as well use for its line a strip of land along or within reasonable reach of a roadway or railroad as place them upon the perpendicular ground already appropriated by such road. Such being the case, it is manifest that an attempt by a telegraph company to use the entire length of a railroad for its lines, as is here sought to be done, is not based upon imperative necessity, without which its grant "to construct, maintain, and operate" would be defeated, but that such proposed location is a matter of economy and convenience. It is clear, therefore, that from the nature of things, no implied grant of a federal power of eminent domain is essential to the enjoyment of the franchise conferred by this act. Indeed, the case of Pensacola Tel. Co. v. Western Union Tel. Co., referred to above, notably illustrates the efficacy of the act to secure to a telegraph company, even against hostile legislation, full enjoyment of the right to operate its lines "over and along any of the military or post roads of the United States," without delegation of the right of eminent domain.

Out of deference to the earnest argument of counsel representing the telegraph company, who contend the construction of the act of 1866 in that regard is an open one, we have discussed it as such, and indicated our independent views. But, as we read the decisions, we think the question has been settled by the supreme court of the United States. This statute first came before that tribunal in Pensacola Tel. Co. v. Western Union Tel. Co., supra. An ex-

amination of that case shows that its construction was there involved. The appellant, in the argument of counsel, contended the statute simply conferred on telegraph companies "a right of way over the public domain"; that it extended "only to such military and post roads as are upon the public domain"; and therefore had no application to the case in hand,—that of a telegraph line constructed on a railroad not on the public domain. The court, however, held the act extended to military and post roads generally, in addition to those on the public domain, but that no attempt was made thereby to confer rights to private property. In defining what the law did provide and mean, the court, to meet criticism of it, stated what it did not provide. It showed it extended to all military and post roads of the United States, and therefore to the railroad on which the telegraph in controversy was located, but that it did not affect private property. It was there said by Chief Justice Waite:

"No question arises as to the authority of congress to provide for the appropriation of private property to the uses of the telegraph, for no such attempt has been made. The use of public property alone is granted. If private property is acquired, it must, so far as the present legislation is concerned, be obtained by private arrangement with its owner. No compulsory proceedings are authorized. State sovereignty under the constitution is not interfered with. Only national privileges are granted."

In the case of Western Union Tel. Co. v. Ann Arbor R. Co., 178 U. S. 243, 20 Sup. Ct. 867, 44 L. Ed. 1052, the construction placed upon the statute in the Pensacola Case was restated and approved. The right of the telegraph company in the Ann Arbor Case to a review by the supreme court was in question, and such right depended on the existence of a federal question. In the complaint in the state court, where the case was originally brought, the allegation of the bill was that the telegraph company had accepted the provisions of the act in question, and that, independent of the contract made with the railroad, it had "a right to maintain its telegraph line on what was formerly said Frankford & Southeastern Railroad under the provisions of the statute of the United States." If this allegation of a property right independent of the contract, and based on the provisions of the act of 1866, did not, as the court said, "really and substantially involve a dispute or controversy as to the effect and construction of the constitution or laws of the United States, upon the determination of which the result depends," then it was "not a suit arising under the constitution or laws," and the judgment of the state court was not reviewable by the supreme court. It was accordingly held that the cause of action was one based on contract, and that the construction of the act of 1866 was not involved, and the judgment not reviewable. As we read the decision, one reason why the complaint could not be regarded as raising a federal question was that the court would not, in view of its construction of the statute in the Pensacola Case, permit it to be asserted as a ground of federal jurisdiction. In that regard, the court, speaking by Chief Justice Fuller, said:

"It has long been settled that that statute did not confer on telegraph companies the right to enter on private property without the consent of the owner, and erect the necessary structures for their business; but it does

provide that whenever the consent of the owner is obtained, no state legislation shall prevent the occupation of post roads for telegraph purposes by such corporations as are willing to avail themselves of the privileges.' Pensacola Tel. Co. v. Western Union Tel. Co., 96 U. S. 1, 24 L. Ed. 708. * * * As we have said, it was not asserted in argument that the telegraph company had the right, independently of the contract, to maintain its line on the railroad company's property; and, in view of the settled construction of the statute, we could not permit such a construction to be raised as a basis of jurisdiction."

If the construction thus given this statute is the supreme law of the land, and binding upon all inferior tribunals, as it unquestionably is, we must hold, as we do, that the act of 1866 does "not confer on telegraph companies the right to enter on private property without the consent of the owner, and erect the necessary structures for their business," and no such federal right of eminent domain as this particular petitioner claims is vested in it thereby.

We next inquire whether a right of appropriation is vested in the Atlantic & Ohio Telegraph Company, the lessor of the Western Union Telegraph Company, by the constitution and statutes of Pennsylvania. As stated above, we have assumed for present purposes that any right of eminent domain possessed by the Atlantic & Ohio Telegraph Company is vested in the Western Union Telegraph Company. What, then, are the terms of the statutory and constitutional grant to the former company, and what is the construction given such grants by the supreme court of Pennsylvania? Is the Atlantic & Ohio Telegraph Company authorized to appropriate land already appropriated for the use as a railroad right of way? The Pennsylvania act of March 24, 1849, incorporating that company, constitutes it a body corporate "for the purpose of making, using and maintaining telegraph lines and communication by one or more routes between the cities of Philadelphia and Pittsburg and intermediate places." By certain other legislation, not necessary to here specify, it was empowered "to purchase, make, use and maintain any connecting or side lines." It should be noted in passing that the route between Philadelphia and Pittsburg, the termini of the charter, covers some 350 miles of the total right of way sought to be appropriated. Section 5 of the charter provides:

"That it shall and may be lawful for the said corporation hereby created, to erect and construct works, edifices, fixtures and structures along and across any of the roads, highways, streets and waters within this state; the said works to be so placed as not to interfere with the common use of such roads, highways, streets and waters."

It further provides that:

"The said corporation and all other persons by them authorized, appointed or employed, shall have power and authority to enter into and upon, hold, occupy and enjoy any land for the purpose of locating and constructing the said telegraph lines, and using, repairing, maintaining and enjoying the same, upon which the same may be located, or which may be necessary or convenient for the location of the same."

Now, this section, it will be observed, consists of two parts. The first makes it lawful for the corporation to construct "along and across any of the roads, highways, streets and waters within this state"; the second confers power and authority "to enter into and

upon, hold, occupy and enjoy any land for the purpose of locating and constructing the said telegraph lines, and using, repairing, maintaining and enjoying the same, upon which the same may be located, or which may be necessary or convenient for the location of the same." Several things are clear in the construction of this early statute, for it was passed in the early stage of both railroad and telegraph development. As the act contemplated the construction of one or more routes between the cities of Philadelphia and Pittsburg, there was no implication that any one route was essential to the enjoyment of the franchise to construct. Not only is no mention made of a railroad or railway in the act, but it was not until a later period that these charter termini were connected by rail. But when the charter was granted the two cities named were connected by systems of public roads or highways. It is obvious, therefore, that in the grant of a corporate franchise to construct one or more routes the legislature did not contemplate the then use of railroads, for there was then no such connecting railroad line, but provided other means by which one or more routes could be secured across the state and fully enjoyed. These means consisted in the free grant— for no provision was made for compensation therefor—"along and across any of the roads, highways, streets and waters within this state," and the other in the power "to enter into and upon, hold, occupy and enjoy any land for the purposes," etc., making compensation, of course, to the owner. It will thus be seen that the purpose of the grant could be fulfilled without embracing railroads. They are not mentioned, and very probably were not at that early date meant to be included in the generic terms "roads, highways and streets." At that time no legislation in Pennsylvania defined them as highways, and the context shows that the roads, highways, and streets contemplated were such as were open to common use,—i. e., the public property,—for it was enacted that the telegraph was to be placed so as "not to interfere with the common use of such roads, highways, streets, and waters." Evidently this language referred to public property of a kind the public had a common right to use. While a railroad is a public highway in the sense it is a common carrier and has a public use to fulfill, yet it never becomes a public highway in the sense it is subject to common use. It is public in the common duty it owes the public, but private in operation and use to fulfill such duty. The authorities are clear that the public cannot make common use of it as a public passageway, and that one doing so subjects himself to the liability of a trespasser. Philadelphia & R. R. Co. v. Hummell, 44 Pa. 378, 84 Am. Dec. 457. The most that can be said of this charter is that it leaves it a debatable question whether it extends to railroads. We have seen it does not by express words. We have seen it expressly grants the privilege of entering upon certain property already subjected to a public use, and its mention of specific kinds of such public use as rights of way upon which the telegraph company might enter implies noninclusion of property in other and different kinds of public use. We have seen that the use of a railroad was not essential to the enjoyment of the franchise, and that express provision was made for its enjoyment in

other ways. It would seem, therefore, that neither in express terms
nor by imperative implication to fulfill the charter object is the
right to enter upon a railroad given by this charter; and that a
power to appropriate railroad property was not essential to the fran-
chise to construct a telegraph line between Philadelphia and Pitts-
burg is evidenced by the charter. Indeed, that instrument itself
shows that prior to its grant, and therefore without its aid, or the
exercise of the power of eminent domain, there was (vide section 2
of the charter) a "telegraph line now in use between the cities of
Philadelphia and Pittsburg, * * * [which] shall be taken and
considered to be the capital of said corporation." The claim for
an implied power is met by the fact that the expressed power is suf-
ficient to effect the charter object. "The implication does not arise
if the powers expressly conferred can, by reasonable intendment, be
exercised without the appropriation of property already actually
held and used for another public use." In re Boston & A. R. Co.,
supra; Inhabitants of Springfield v. Connecticut R. R. Co., supra.

The general principles and rules of construction applicable to such
charters are fairly stated in 10 Am. & Eng. Enc. Law (2d Ed.) p. 1054,
as follows:

"Since the exercise of the powers of eminent domain—the taking of a man's
property without his consent—is against common right, it cannot generally
be implied from a grant of authority to construct a public work. In order
for a corporation to exercise the power, the right must be granted by express
terms or by necessary implication. Therefore all acts relating to the taking
of private property are to be strictly construed, and not extended by impli-
cation. * * * But in some cases it has been said that, if the implication
in favor of the intended exercise of the power is very strong,—for example,
that the grant itself would be defeated if the company were not allowed to
condemn,—the right to condemn may be exercised, on the theory that an
implied right has been granted."

This statement is in accord with the federal view. Charles River
Bridge Co. v. Warren Bridge Co., 11 Pet. 425, 9 L. Ed. 773, 938,
and with the Pennsylvania decisions. Thus, in the Appeal of Penn-
sylvania R. Co., 93 Pa. 159, where that company sought to take the
property of a street railway, the supreme court, in an able opinion
by Chief Justice Gordon, announced the rule, which has since been
followed, where a corporation seeks to construe a corporate grant so
as to interfere with a previous grant of the same kind. It was there
said that the plea of necessity "must be tested by the rule, now of
universal acceptation, that all acts of incorporation, and acts extending
corporate privileges, are to be construed most strongly against the
companies setting them up, and that whatever is not unequivocally
granted must be taken as withheld. This rule is to be held in all
its rigor where the attempt is so to construe a corporate grant as
to interfere with a previous grant of the same kind." In the later
case of Appeal of Groff, 128 Pa. 632, 18 Atl. 431, the same doctrine
was reannounced by that court in an opinion by Mr. Justice Mitchell,
wherein he said:

"It has been settled, since the cases of In re Plan of Third Division of
Dist. of Kensington, 2 Rawle, 445, and In re Philadelphia & T. R. Co., 6
Whart. 25, 36 Am. Dec. 202, that property devoted to public uses, including
franchises, is subject to eminent domain, and may be taken for other public

uses; but it is equally settled that it cannot be so taken without legislative authority expressed in clear terms, or by necessary implication. * * * In the long line of decisions from Stormfeltz v. Turnpike Co., 13 Pa. 555, down to Appeal of Pittsburg Junction R. Co., 122 Pa. 511, 6 Atl. 564, 9 Am. St. Rep. 128, the rule itself has never been questioned. * * * The imperative and inevitable nature of the implication requisite has been laid down in all our cases, and nowhere more strongly than in some of the most recent and carefully considered. See Appeal of Pittsburg Junction R. Co., 122 Pa. 511, 6 Atl. 564, 9 Am. St. Rep. 128; Appeal of Pennsylvania R. Co., 93 Pa. 150; Appeal of Pennsylvania R. Co., 115 Pa. 517, 5 Atl. 872; Stormfeltz v. Turnpike Co., 13 Pa. 555; Cake v. Railroad Co., 87 Pa. 307; Appeal of Tyrone School Dist., 22 Wkly. Notes Cas. 513."

In Appeal of Pittsburg Junction R. Co., 122 Pa. 526, 6 Atl. 564, 9 Am. St. Rep. 128, the right of one railroad to extend its line through a yard of another arose. Such taking was there enjoined, the court citing and relying upon the opinion of Judge McKennan in this court in the case of Lake Shore & M. S. R. Co. v. New York, C. & St. L. Ry. Co. (C. C.) 8 Fed. 858, that "every reasonable intendment must be taken in favor of the primary right of the complainant. At the points of the alleged conflict no actual encroachment upon their rights can be sanctioned or allowed; and in measuring their extent there must be a liberal consideration of the future, as well as the existing necessities of the complainant, touching the use of the existing tracks, the construction of additional ones, the convenient storage of its freight at all seasons, and the unembarrassed transaction of its freight business,"—and restating the law as declared in the Appeal of Pennsylvania R. Co., 93 Pa. 159, which we have cited above. The cases of Appeal of Sharon R. Co., 122 Pa. 533, 17 Atl. 234, 9 Am. St. Rep. 133, and Twelfth St. Market Co. v. Philadelphia & R. T. R. Co., 142 Pa. 581, 21 Atl. 902, 989, are to the same effect.

Such being the limitations placed by the Pennsylvania decisions upon appropriating railroads, we see no reason forbidding, and every reason suggesting, the same limitations should be enforced in the case of telegraph companies. In railroad location, as we have noted above, grade is an essential factor; in telegraph construction it is at most a mere convenience. In railroad construction, the narrowness of defiles, the opening of gorges, the location of streams, the general topography of the country, or the lack of curve space may, under certain circumstances, render it imperatively necessary that a second road should entrench upon a primary location. None of these factors ordinarily create imperative necessity in the case of telegraph lines. With them grades may be ignored, gorges avoided, hills or mountains crossed. In other words, there is no necessity, in the nature of things, that ordinarily requires a telegraph line to be placed on a railroad right of way. Its location there is obviously a matter of convenience and economy. Indeed, an examination of the petition in this case shows that no allegation is made, and it is quite apparent from the nature of things none could be made, that there is any imperative necessity for the location by the telegraph company of its poles on the railroad right of way. While the petition avers the patent fact that "it is necessary for continued maintenance and operation of its said lines of telegraph" that it should have the right to use and maintain poles along the right of way, yet it does not,

and of course could not, aver that such occupation is necessary to the enjoyment of its franchise. Under the laws of Pennsylvania, public roads, being the property of the state, are subject to its direction and control. "In England a highway is the property of the king as parens patriæ, or universal trustee; in Pennsylvania," says the supreme court in Re Philadelphia & T. R. Co., 6 Whart. 43, "it is the property of the people, not of a particular district, but of the whole state; who, constituting as they do the legitimate sovereign, may dispose of it by their representatives, and at their pleasure. Highways, therefore, being universally the property of the state, are subject to its absolute direction and control." Such being the case, it is manifest that in its grant to the Atlantic & Ohio Telegraph Company of a right to construct "along and across any of the roads, highways, streets and waters within this state" the state has, to the extent of its ability in that regard, made provisions by its highway system for that company to exercise its corporate franchise of constructing a line or lines from Philadelphia to Pittsburg. It is therefore apparent that there is no necessity to read into this charter, as a power requisite to the fulfillment of the charter object, an implied right of eminent domain enabling it to reappropriate property already subjected to public use as a railroad right of way, inasmuch as the state has conferred an express grant of a right of way over public property in its roads, highways, streets, and waters sufficient to enable the company to effectuate the object of its creation. In the case of New York City & N. R. Co. v. Central Union Tel. Co., 21 Hun, 261, a substantially similar charter grant to the one here in question was held not to authorize entry on a railroad. It was there held a "special authority to a telegraph company to build upon, over, or under any public road, street, or highway, is to be construed strictly, and does not authorize construction over a railroad." From these authorities, as well as from independent reasoning, it would, therefore, seem clear that no right of eminent domain to enter upon the rights of way of railroads was conferred upon the Atlantic & Ohio Telegraph Company by its charter.

This court being, then, of opinion from its own independent examination that no federal right of eminent domain was vested in the Western Union Telegraph Company by the act of 1866 authorizing it to appropriate the right of way of the Pennsylvania Railroad Company, and that no state right of eminent domain was vested in the Atlantic & Ohio Telegraph Company which warranted the appropriation of said right of way, and such conclusion being in accord with the decisions of the supreme court of the United States and of the supreme court of Pennsylvania severally relating thereto, the duty of this court to refuse to approve this bond and to order this petition dismissed is clear.

We next consider the bill filed on the equity side of the court, wherein the Western Union Telegraph Company seeks a preliminary injunction against the Pennsylvania Railroad Company "pending the determination of the said action at law," and "such other and further relief as the case may require." The action at law referred to is the petition to condemn, which, being dismissed, constitutes no ground

for relief under this bill. In considering the question involved in the general prayer for relief, it will be noted that our jurisdiction in this bill rests on the diverse citizenship of the two parties litigant, the Western Union Telegraph Company, a corporation of the state of New York, and the Pennsylvania Railroad Company, a corporation of Pennsylvania, and it will be further especially noted that these parties hold to each other the relation of landlord and tenant. The Western Union Telegraph Company, since September 20, 1881, has been in possession of the right of way in question as a tenant of the Pennsylvania Railroad Company under lease. It has attorned to the railroad during that long period, and acknowledged its paramount title by the payment of rent. When this bill was filed, November 26, 1902, the notice to quit on December 1, 1902, had not matured, and the telegraph company was then in lawful possession as a tenant under the lease. Moreover, it will be observed that one of the grounds for relief here urged is that by an alleged extension of the lease by waiver of the notice to quit this relation of tenancy continued after December 1, 1902, or, as stated by complainant's brief, "complainant bases its right to ultimate recovery in this controversy upon any one of the following propositions: First, that respondent waived its notice to quit by its subsequent unqualified acceptance of an aliquot monthly payment of a specified yearly rental reserved in the contract, which sum it still retains and does not offer to refund." It will, therefore, be seen that this bill is one between landlord and tenant, and relief is asked by reason of the existence and continuance to the present time of the relation of tenancy. It is the case of a tenant seeking to enjoin the landlord from re-entry, and the general legal principles applicable to a suit between landlord and tenant apply thereto. Now, there is probably no principle of law more firmly settled than that a tenant is not permitted to attack or impeach his landlord's title. It is based on sound and wholesome reasons. The possession of the tenant is in law regarded as that of the landlord, and, where a relation of tenancy has once been fairly and advisedly established between parties, the law will not permit the tenant, so long as he holds possession of the property, to litigate to retain possession on the basis or averment that the title is not in the landlord. The tenant's mouth is not closed to assert the truth. If the tenancy was procured by fraud, deceit, or misrepresentation of the landlord, the tenant is allowed to prove such fraud, and show that the relation of landlord and tenant never in fact existed. Baskin v. Seechrist, 6 Barr, 163; Smith v. McCurdy, 3 Phila. 488. If, after becoming a tenant, he desires to assert a title adverse to that of the landlord, he can do so; but he must first repudiate his tenancy, and, if called upon, surrender possession. So long as he remains a tenant, the relation of tenancy estops him from attacking the landlord's title. The grounds for the rule are well summarized in 11 Am. & Eng. Enc. Law (2d Ed.) 443:

"The principle upon which this doctrine is based is that the title of the lessee is in fact the title of the lessor. He comes in and holds by virtue of it, and rests upon it to maintain and justify his possession. He professes to have no independent right in himself, and it is a part of the very essence of

the contract under which he claims that the paramount ownership of the lessor shall be acknowledged during the continuance of the lease, and that possession shall be surrendered at its expiration; and hence he cannot deny the lessor's title without breach of good faith and common honesty."

While the rule is recognized as a general abstract principle of law, and as one which courts enforce, yet in cases like this, where large interests are at stake, and its enforcement might seem to preclude a litigant from asserting supposed rights, it is well to turn to some of the master minds of the law, and from their words learn the sound reasons and just grounds whereon this "long-settled and salutary rule," as it was styled by the supreme court of the United States in Stott v. Rutherford, 92 U. S. 107, 23 L. Ed. 486, rests. These reasons not alone vindicate the rule's existence, but serve to show that its enforcement prevents litigation, and exactly awards to both parties to a tenancy the results they expected when they assumed that relation.   In Blight v. Rochester, 7 Wheat. 547, 5 L. Ed. 516, Chief Justice Marshall says:

"This principle originates in the relation between lessor and lessee, and, so far as respects them, is well established, and ought to be maintained.   The title of the lessee is in fact the title of the lessor.   He comes in by virtue of it, holds by virtue of it, and rests upon it to maintain and justify his possession.   He professes to have no independent right in himself, and it is a part of the very essence of the contract under which he claims that the paramount ownership of the lessor shall be acknowledged during the continuance of the lease, and that possession shall be surrendered at its expiration.   He cannot be allowed to controvert the title of the lessor without disparaging his own, and he cannot set up the title of another without violating that contract by which he obtains and holds possession; and breaking the faith which he has pledged, and the obligation of which is still continuing, and in full operation."

The Pennsylvania rule, and the ground on which it stands, are well stated by Judge Black in Thayer v. Society, 20 Pa. 62:

"A lease given in good faith by one party and accepted by another with his eyes open is valid and binding on both, though the actual occupancy be not changed.   It creates the relation of landlord and tenant.   It is a solemn admission of the lessor's title.   It disarms him of the power to take possession during the term, and therefore ought to be conclusive of his right to do so afterwards.   The mere fact that the tenant has a better title than his landlord does not of itself raise the presumption that the lease was a fraud, or accepted by mistake.   The lease is not rendered void by proving title in the lessee.   To make the law otherwise would be to say that the tenant shall not set up title in himself when he has none, and that the lease shall be no evidence of the landlord's rights except when he can prove them without it."

Now, the spirit of the rule requires its application not only where possession is first acquired by virtue of the tenancy, but where there has been a prior adverse possession, and such adverse possession is changed to one under a tenancy evidenced by lease.   Rankin v. Simpson, 19 Pa. 475, 57 Am. Dec. 668, as well as the case last cited, so rules:

"If a purchaser by parol take possession under his contract, and afterward attorn to the vendor as landlord, or fix upon himself any other character than that with which he entered, he lets go his equities, and his possession is referred to his new agreement.   And where the agreement, as in this case, is reduced to writing in terms prefectly inconsistent with the idea of a parol sale, it becomes the most faithful memorial which ingenuity can devise or the law adopt."

In the present case such rule of estoppel applies. Indeed, the facts show the case is a peculiarly proper one for its enforcement. Whatever may have been, on September 20, 1881, the rights of the Atlantic & Ohio Telegraph Company,—and to these we refer later,— or those of the Western Union Telegraph Company, as its lessee, the latter company on that day entered into a contract with the Pennsylvania Railroad Company, whereby the relation of landlord and tenant was created. As a badge and incident of such tenancy, it agreed to pay a rental, and, as a fruit of such tenancy, it had had undisturbed possession of and used a telegraphic right of way for 21 years on the land of the railroad company. No fraud or misrepresentation is alleged in the making of the lease, or in the creation of this relation of landlord and tenant. Indeed, from the terms of the lease it is clear that one of its objects was to put an end to all prior claims by placing the parties thereto in the relation of tenancy, and that, as stated in the lease, "the rights and easements of the telegraph company upon the right of way of said railroad company shall be such only as are granted by this agreement, and shall cease with its termination." The purpose to accept a servient, terminable tenancy is made clear in the contract of September 20, 1881, wherein the Western Union Telegraph Company stipulated:

"This agreement is to continue in force for and during the term of twenty years from its date. * * * If no new agreement be made by the parties hereto, the telegraph company shall at the termination of this contract, or at any time thereafter upon receiving written notice from the railroad company, remove, within six months from the receipt of said notice, all of its poles and wires, and leave the property of the railroad company in good condition, and free from the incumbrance thereof to the satisfaction of the general manager or other proper officer of the railroad company; and, if not so removed, the railroad company may remove them at the expense of the telegraph company."

The purpose to forego all other claims and relations is evidenced by its release in these words:

"Any easement or right of way heretofore acquired by the telegraph company upon any of the roads embraced in this agreement or by assignment of contracts or agreements made by other companies with the railroad company, or with any of the companies whose roads or property are embraced in the schedule hereto attached, is hereby relinquished and abandoned, and the rights and easements of the telegraph company upon the right of way of said railroad company shall be such only as are granted by this agreement, and shall cease with its termination."

The contention of the tenant, the Western Union Telegraph Company, that it had no right to surrender or release the telegraphic right of way of its lessor, the Atlantic & Ohio Telegraph Company, because such right was inalienable, and its act in that regard was ultra vires, cannot, even if well taken, affect the present case. In effect, this is but to attack the landlord's title. In substance it says no title was vested in the railroad by such release or conveyance. This, as we have seen, the law, so long as the tenant holds possession under the lease, will not permit. Moreover, the estoppel in this case, be it observed, does not depend upon the capacity of the Western Union Telegraph Company to release the rights of the Atlantic & Ohio Telegraph Company and the validity of such release. The

estoppel the law here enforces is not an estoppel by deed. It is not based on the validity of this release. It stands on higher ground. It is one created by the relation of the parties,—landlord and tenant. It "originates in the relation between lessor and lessee" (Blight's Lessee v. Rochester, supra); and it may exist even though the lessor or lessee be incompetent to contract (Wilson v. James, 79 N. C. 349; Helmes v. Stewart, 26 Mo. 529; Ramires v. Kent, 2 Cal. 558; Daniels v. Tearney, 102 U. S. 415, 26 L. Ed. 187). In view of the relation of tenancy existing between these parties (a relation running over a period of more than 20 years, and reaffirmed and acknowledged each month by the payment of rent), and the absence of any repudiation of such relation during all those years, we are firmly of opinion that a court of equity should, in support of this wholesome rule, hold, as we do, that the tenant is estopped from setting up in this bill as a ground for denying the landlord re-entry that the latter has no title to that which the complainant still holds under the lease.

But apart from the estoppel of the tenant, there is another and insuperable objection to this court in this case passing upon the rights which are alleged to have vested in the Atlantic & Ohio Telegraph Company by virtue of its contract of June 20, 1864, with the Pennsylvania Railroad Company. It is manifest that, where a court of equity is required to ascertain and determine rights vested by a contract, the parties to such contract, if they have not disposed of their interests thereunder, should be made parties to such litigation. Railroad Co. v. Crane, 113 U. S. 424, 5 Sup. Ct. 578, 28 L. Ed. 1064; Gregory v. Stetson, 133 U. S. 586, 10 Sup. Ct. 422, 33 L. Ed. 792; West v. Randall, 2 Mason, 181, Fed. Cas. No. 17,424; Land Co. v. Elkins (C. C.) 20 Fed. 545; Florence Sewing Mach. Co. v. Singer Mfg. Co., 8 Blatchf. 113, Fed. Cas. No. 4,884; Williams v. Bankhead, 19 Wall. 563, 22 L. Ed. 184; 15 Enc. Pl. & Prac. 611. The Atlantic & Ohio Telegraph Company is not a party to this suit, and, being a Pennsylvania corporation, it cannot be made one without ousting jurisdiction. If, by its contract of June 20, 1864, a perpetual telegraphic right of way was acquired by that company from the Pennsylvania Railroad Company, no conveyance or assignment thereof by it is shown to have been made. It is true that previous thereto, to wit, on April 15, 1864, the Atlantic & Ohio Telegraph Company had made a lease with the Western Union Telegraph Company wherein it leased "to the party of the second part, for the term of ten years, commencing on the first day of April, A. D. 1864, and to continue thereafter until terminated by six months' notice, at the option of either party, all their telegraph lines, instruments, property, offices, and franchises, with the right to work said lines at the expense of the said party of the second part, and enjoy the profits of the same as fully and effectually as heretofore done by the party of the first part, and the party of the second part agreeing to assume all the present indebtedness, liabilities, contracts, and obligations of the first part." But this was simply a lease of it, and it did not pretend to assign or convey, the property or franchise of the lessor. After 10 years it was revocable by either party on 6 months' notice. Now, whatever equitable rights may exist between the two

telegraph companies by reason of said prior lease or the ownership of stock in the lessor company by the lessee, it has not been shown that the title and reversionary ownership to any interest in land vested by the contract of June 20, 1864, has been conveyed by the Atlantic & Ohio Telegraph Company. Presumptively, ownership thereof continues in that corporation. Ownership of its corporate stock does not vest the title to the Atlantic & Ohio Telegraph Company's property in the complainant, and under its lease the latter is a tenant at will, revocable on notice of six months. In view of these facts and of the prayers for relief, in the determination of which the Atlantic & Ohio Telegraph Company is interested, we are of opinion not only that the last-named company is a necessary party, but that the railroad company has a right to the presence of such company upon the record that the rights of all parties might be concluded by one decree. But while the Atlantic & Ohio Telegraph Company is not before us, and its rights cannot be determined and decreed, it is proper to here refer to the showing of such alleged rights as bearing on the motion for a preliminary injunction. Where the right to an injunction depends on title, it is generally necessary that the title alleged to justify the issue thereof be set forth with clearness. (Whitelegg v. Whitelegg, 1 Brown, Ch. 57; Davis v. Leo, 6 Ves. 784); and, unless the complainant's right be clear, a court of equity refuses to interfere (Field v. Jackson, 2 Dick. 599). Without, then, passing upon or deciding as to the validity of the right of way vested in the Atlantic & Ohio Telegraph Company, it would hardly seem the bill sets forth such showing of title in that company as should lead a court of chancery to grant a preliminary injunction, and enjoin the respondent from re-entry. Assuming the Atlantic & Ohio Telegraph Company, prior to September 20, 1881, had acquired a permanent telegraphic right of way upon the right of way of the railroad in pursuance of its charter, which gave it power to "purchase, receive, have, hold, and enjoy, to them, their successors and assigns, such lands, tenements, and hereditaments, goods, chattels, and all estate, real, personal, and mixed, of what kind and quality soever, as may be necessary for the purposes of the company," yet the charter provides further: "And the same from time to time may sell, convey, mortgage, grant, alien, dispose of." Having, then, the power to dispose of what it acquired, it would seem that, if it had permitted the Pennsylvania Railroad Company to hold adverse possession of such right of way, as that road has done by its tenant, the Western Union Telegraph Company, for more than 21 years, the title thereto has been acquired by the latter company. In Pennsylvania the right of possession is acquired by 21 years' possession, and constitutes a positive title on which one may recover in ejectment. Pederick v. Searle, 5 Serg. & R. 240. It would seem, therefore, that the title alleged is not of such certain character as to warrant the grant of a preliminary injunction.

The landlord's title, as between it and the tenant, being assumed, we next inquire whether the tenant has shown any reason why re-entry should be enjoined. The provisions of the contract in relation to length and termination have been set forth above. On May 14,

1902, the Pennsylvania Railroad Company, in pursuance thereof, through its board of directors, and acting by its president and secretary, gave notice, under its seal, to the Western Union Telegraph Company, as follows:

"You are hereby notified to remove within six (6) months from the first day of June, 1902, all of your poles, wires, and property from the right of way and property of this company and of the other companies named in a certain agreement between this company and you, dated the twentieth day of September, Anno Domini 1881 (a copy whereof is hereto attached), or named in any addition or additions, supplement or supplements, written or verbal, to said contract, and to leave the property of this company and the other companies referred to in good condition and free from the incumbrance of your said poles, wires, and other property, to the satisfaction of the general manager of this company. And you are also notified that, if not so removed, and such property left in said good condition by you, this company will, at your expense, cause your said poles, wires, and other property occupying the right of way or property of this and the other companies referred to to be removed, and said property left in good condition, free from the incumbrance of the said wires, poles, and other property, to the satisfaction of the general manager of this company."

Under this notice the tenant had six months leeway from June 1, 1902, to remove, and during such leeway the monthly rental of $6,250, payable by the telegraph company, and the monthly payment of $1,250, payable by the railroad for special telegraphic service, were mutually waived; the monthly payments to be made by the telegraph company of one-half the cash receipts for telegraphic service rendered the public not being waived, presumably conditioned during the six-months leeway. This notice, under the contract provisions, entitled the landlord to resume possession December 1, 1902. It is, however, contended by the complainant that the notice to quit was waived, and that a tenancy under the lease still continues. It will be observed that withdrawal of a notice to quit is not, like a waiver of forfeiture, the act of one party, but requires the assent of both; and, when such joint assent is given, it creates a new tenancy. The question, then, whether there was a waiver of a notice to quit is one of intent on the part of both parties to the tenancy. "When a valid notice to quit is given by the landlord or tenant, the party to whom it is given is entitled to count upon it, and it cannot be withdrawn without the consent of both parties. If such consent is given, there is a new agreement between the parties, and a new tenancy is created, which exists only under that new agreement." 1 Wood, Landl. & T. § 44, citing Murrell v. Milward, 3 Mees. & W. 328; Tayleur v. Wildin, L. R. 3 Exch. 303; Blyth v. Dennett, 13 C. B. 178. See, also, Fitzpatrick v. Childs, 2 Brewst. 365; Cheny v. Batten, 1 Cowp. 243. In the present case the facts alleged to evidence such waiver are undisputed, and are found in written communications between the parties, the sufficiency of which can be determined by the court as well as on final hearing. What are those facts? The notice to quit was, as we have seen, given May 15th, and was addressed to the Western Union Telegraph Company. It was replied to by the president of that company, who addressed his letter to the president of the railroad. Thereafter all correspondence in reference to the lease and the position of the parties with relation thereto was conducted by

120 F.—25

these two men. On May 20th the president of the telegraph company wrote as follows:

"I am in receipt of a letter from Louis Neilson, secretary, dated May 15th, in relation to the termination of the contract between the Pennsylvania Railroad Company and the Western Union Telegraph Company, dated September 20, 1881. * * * I understand that for some time prior to my election as president of this company in March last negotiations had been in progress between the officers of our respective companies for a renewal of these contracts on terms satisfactory to both parties; and Vice President Clark has recently turned over to me a draft of proposed new agreement, in connection with which I believe we have been awaiting some figures from your company. I shall be glad to take up the matter actively, either here or at Philadelphia, at your convenience."

On the same day the treasurer of the telegraph company, following the usual form and practice evidenced by the vouchers for the preceding months, sent to the comptroller of the railroad a voucher for "payment due May 20, 1902, as per contract, $6,250." This payment, it will be observed, covers five days subsequent to the notice to quit. We would not be justified, without convincing proof, in finding this payment for five days (a transaction following the ordinary course of monthly payments between the treasuries) was meant by the heads of these companies, who were conducting these negotiations, to be a waiver of the formal notice of termination which was authorized by a vote of the directorate, and evidenced by the seal of the railroad company. Under the circumstances we are justified in regarding it as a routine payment, such as was sent and received during a contract running more than 20 years. But payment and acceptance of rent, even after the expiration of a notice to quit,—a much stronger case than the present,—is not in itself a waiver on the part of the landlord, but is merely evidence to be considered in connection with the circumstances of the case. Fitzpatrick v. Childs, supra; Cheny v. Batten, supra; Prindle v. Anderson, 19 Wend. 391. Moreover, there is no proof whatever that the two treasury officers who made and received this payment had authority to renew a lease of this nature. Since action to terminate was by the board of directors, presumptively executive officers would not have authority to renew; but, if such authority to renew existed, it is sufficient to say it is not shown. If the payment was known to the president of the telegraph company, who was making answer to the notice to quit, he did not treat it as evidencing an intention to renew a tenancy under the old contract, for he expressed the desire to actively take up the consideration of the new contract, which had been prepared, and which he evidently thought would be adopted. If representing his company in this matter, he did not know of the payment, and it was simply a routine one, clearly it should be treated as such by the court. The action and reply of the president of the railroad the next day shows the railroad stood on the notice to vacate. He says:

"In reply to your favor of the 20th instant, I beg to say that none of the companies named in your letter desires to renew or extend its contract with the Western Union Telegraph Co. As you are aware, the contract between the Western Union Telegraph Company and the Pennsylvania R. R. Co. terminated, under its terms, on the 20th of September, 1901, and the notices to which you refer, for the removal of the poles within six months, were

given in accordance with a provision of the contract. If your company desires to discuss any temporary arrangement which may be necessary during the time allowed for the removal of your poles, we shall be glad to take up these matters with you at your convenience."

It will thus be seen that on May 21st the railroad refused to renew or extend the old contract, and stood on the notice to quit. The payment of the five days of rent was treated by the heads of neither of these companies as evidencing a waiver of the notice to quit, or as constituting a renewal of the contract. On June 20, 1902, a similar monthly payment was made, and received by the respective officers of the company. There is no evidence that the heads of either of these companies knew of either of these payments. Moreover, it will be observed that they were wholly voluntary. There is no averment that the railroad company paid or the telegraph company demanded the monthly charges provided by the eighth section. After both these payments were made, the president of the telegraph company, on June 26, 1902, wrote as follows:

"I have your favor of May 21st, in which you state that none of the companies named in my letter of the 20th desire to renew or extend its contract with the Western Union Telegraph Company, and that the contract between the Western Union Telegraph Company and the Pennsylvania Railroad Company terminated under its terms on the 20th of September, 1901, and that the notices which were referred to for the removal of the poles within six months were given in accordance with a provision of the contract, and that, if my company desires to discuss any temporary arrangement which may be necessary during the time allowed for the removal of its poles, you will be glad to take up those matters with me at my convenience. Replying thereto, I have to state that this company will be glad to have a conference with your company with a view of adjusting amicably any and all differences that may be found to exist between them, thus avoiding litigation, and any possible interference with the duties which this company owes to the government and the public. I request and urge that you fix a time and place for such a conference, which seems to be the more necessary because your letter appears to be based on a material misunderstanding of the facts in relation to the termination of the contracts and the rights of this company, since some of the contracts referred to in your letter are perpetual in their terms, or run during the life of the parties, and therefore cannot be terminated by one party without the consent of the other. As bearing on the subject, I inclose a copy of a letter which I sent and delivered yesterday to the Postal Telegraph Cable Company; also copies of two letters, dated June 24th, to James McCrea, Esq., vice president, Pittsburg, Pa., which letters were sent only after a careful examination of the contracts and the legal rights of the parties by our counsel. It seems proper to add that such a conference as we ask ought to be had before your company concludes any arrangement adverse to this company which would necessitate litigation by this company to enforce its rights. Under the contracts by which the lines of this company on the roads mentioned in your letter of May 21st were brought into existence, the laws of congress, and the constitution and laws of Pennsylvania, this company is advised that it is entitled to maintain and operate its lines of telegraph on the said railroads, subject, only, at most, to make a fair and reasonable compensation to the railway companies for this right; and this company is willing, and hereby offers, to make such compensation. If your company declines further to contract with this company, I respectfully request a meeting for the purpose of agreeing upon the amount of such compensation, and, if no such agreement can be made, that the matter be submitted to arbitration, your company selecting one arbitrator and this company another, and the two arbitrators thus selected to choose a third; or to have the amount of such compensation determined in any other equitable manner. I shall appreciate an answer at your early

convenience, and I venture to express the wish that, in view of the large public and private interests which we represent, you will meet this company in its earnest endeavor to avoid unnecessary and wasteful litigation."

This letter clearly shows that the telegraph company recognized the railroad was standing on the notice to quit, and claiming the contract was terminated; that the telegraph company asserted the original contracts, which antedated that of September 20, 1881, were in force in perpetuity, and "cannot be terminated by one party without the consent of the other." No mention is made of the payment of rent, or any claim made that thereby a new tenancy was created. On the contrary, the ground is taken of rights under the old contracts, and that the notice to quit was without effect. The letter in reply, dated July 5, 1902, was as follows:

"I beg to acknowledge the receipt of yours of the 26th ultimo. In my letter of the 21st of May I suggested a conference, which I thought you might possibly desire to have for the purpose of making any temporary arrangements you might find necessary under the notice which has been given to your company. This conference, I infer, you do not care to have. A conference concerning the matters you suggest would be useless, as your company asserts rights upon the lines of railroad of the companies I represent which they cannot concede. Noting your reference to the Postal Telegraph Cable Company, I beg to advise you that a contract has been concluded with that company covering the railroads included in the contract which terminated on September 20th last, under the terms of which the Postal Telegraph Cable Company will at once begin to transact a commercial telegraph business at the stations of the railroad companies; and, while the right of your company to do business at such stations has ceased, yet, as we are desirous of causing you as little inconvenience as possible, we will permit our operators to continue to receive and transmit such messages as the public may desire to send by your lines until September 30th next; the operators to be considered as acting as your agents in that respect, and you to account to the railroad companies for their compensation on a basis equal to that fixed by the former contract. To avoid unnecessary loss to your company incident to the removal of your poles and wires, we are willing to purchase, at a fair valuation, such of the lines as we can make use of; and, if you desire to take up this question, Mr. Charles M. Sheaffer, superintendent of telegraph, will hold himself in readiness to meet a representative of your company to agree upon the price of such lines."

It will thus be seen that the heads of the two companies, who conducted these negotiations, did not regard, claim, or even suggest that these payments were a waiver of the notice, or constituted an agreement for a new tenancy. As the creation of such a relation is a question of mutual intent, and as there was no such mutual intent, we are justified in finding, as we do, that there was no waiver of the notice to quit. The omission of the railroad company to pay or tender back this money cannot be regarded as evidencing an intention on its part to waive its notice and renew the contract. There is no proof why it has not returned the money, but, in view of the provisions of the contract whereby the telegraph company was bound to pay the railroad monthly one-half its cash receipts for public service, and the claim made in the last-mentioned letter for payment therefor, we are justified in concluding the retention of this voluntarily paid sum was not necessarily a conclusive act, but an equivocal one, and possibly referable to the liquidation of such indebtedness.

After careful examination of all the questions raised, and due con-

sideration thereof, we find no ground for the grant of a preliminary injunction. Let orders in accordance with this opinion, dismissing the petition to condemn in one case and refusing an injunction in the other, be drawn, and submitted to the court.