## BELL ATLANTIC TELEPHONE COMPANIES, et al., Petitioners,

### v.

## FEDERAL COMMUNICATIONS COMMISSION, et al., Respondents,

## Rochester Telephone Corporation, et al., Intervenors.

### Nos. 92–1619, 92–1620, 93–1028 & 93–1053.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1994.

Decided June 10, 1994.

---

Mark L. Evans argued the cause for petitioners. With him on the briefs were Gerald Goldman, Alan I. Horowitz, Lawrence W. Katz, Matthew R. Sutherland, Thomas E. Taylor, Robert A. Mazer, James L. Wurtz, Jeffrey B. Thomas, James P. Tuthill, Richard C. Hartgrove, Michael J. Zpevak, Michael S. Pabian, and Robert S. Lynch. John G. Mullan, Alfred W. Whittaker, and Floyd S. Keene entered appearances in 92–1620. Durwood D. Dupre entered an appearance in 93–1028. Robert B. McKenna, Jr. entered an appearance in 93–1053.

Laurence N. Bourne, Counsel, F.C.C., argued the cause for respondents. With him on the brief were Renee Licht, Acting General Counsel, F.C.C., Daniel M. Armstrong, Associate General Counsel, F.C.C., John E. Ingle, Deputy Associate General Counsel, F.C.C., Anne K. Bingaman, Asst. Atty. Gen., Robert B. Nicholson and Robert J. Wiggers, Attys., U.S. Dept. of Justice. Laurel R. Bergold, Counsel, F.C.C., entered an appearance.

On the joint brief for Telecom intervenors were Andrew D. Lipman, Russell M. Blau, Michael E. Ward, Frank W. Krogh, Donald J. Elardo, W. Theodore Pierson, Jr., Michael L. Glaser, Harsha Krishnan, and Robert J. McKee.

On the joint brief for State intervenors were William Paul Rodgers, Charles D. Gray, James Bradford Ramsay, John F. Povilaitis, and Veronica A. Smith.

On the joint brief for intervenors New England Tel. and Tel. Co. and New York Telephone Co. were E. Edward Bruce, Robert A. Long, Jr., John F. Duffy, Edward R. Wholl, and Joseph DiBella.

On the brief for intervenor U.S. Telephone Ass'n was Martin T. McCue.

Michael J. Shortley, Joseph P. Benkert, Michael L. Glaser, Richard M. Rindler, William T. Pierson, Jr., Henry D. Levine, James

L. Casserly, David A. Nall, Herbert E. Marks, Peter D. Keisler, Marc E. Manly, Brian R. Moir, Alan I. Horowitz, Mark L. Evans, Gerald Goldman, William B. Barfield, Matthew R. Sutherland, Vonya B. McCann, Theodore D. Frank, Thomas E. Taylor, Gail L. Polivy, Richard M. Cahill, Richard McKenna, Robert A. Mazer, James L. Wurtz, Jeffrey B. Thomas, James P. Tuthill, Margaret deB. Brown, Richard C. Hartgrove, Michael J. Zpevak, Floyd S. Keene, Lawrence W. Katz, Michael D. Lowe, John G. Mullan, Alfred W. Whittaker, Michael S. Pabian, David Cosson, and L. Marie Guillory entered appearances for intervenors.

Before MIKVA, Chief Judge; WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Local telephone exchange companies ("LECs") petition for review of two orders of the Federal Communications Commission, promulgated in an informal rulemaking, that require the LECs to set aside a portion of their central offices for occupation and use by competitive access providers ("CAPs"). *Expanded Interconnection with Local Telephone Company Facilities* (FCC Docket No. 91–141), *Report and Order and Notice of Proposed Rulemaking,* 7 F.C.C.R. 7369 (1992) (*"Report and Order"*); *Memorandum Opinion and Order,* 8 F.C.C.R. 127 (1993) (*"Memorandum Opinion"*). The LECs claim that the Commission lacks statutory authority for the orders, that the orders fail to show the reasoned decisionmaking required by the Administrative Procedure Act ("APA"), and that (as to one aspect of the orders) the Commission flouted APA notice-and-comment procedure.

The orders raise constitutional questions that override our customary deference to the Commission's interpretation of its own authority. We grant the petitions for review, vacate the orders in part, and remand for further proceedings.

I

Long-distance telephone calls are transmitted from the customer's premises over an LEC-owned line to an LEC switching center, known as a central office, and from there to the facilities of a long-distance "interexchange" carrier ("IXC"). The call then goes over the IXC's lines to the central offices of another LEC, and then to the destination point. When dedicated lines (*i.e.,* lines devoted exclusively to one customer's business) are used for the local connections, the arrangement is called "special access."

LECs charge tariffed "special access rates" for dedicated lines. These tariffs impose (1) a flat charge for transmission from the customer to the LEC's central office, (2) a distance-sensitive charge for transmission between LEC offices (if applicable), and (3) another flat charge for transmission from the LEC office to the IXC. Under current tariffs, these three elements are "bundled" and cannot be purchased separately. In recent years CAPs have begun to compete with LECs in the "special access" market by providing alternative transmission lines between large customers and the IXCs. Some CAPs offer customers a shorter line that connects them to an LEC switching center, leaving the LEC to connect the customer to the IXC.

The Commission drew attention to problems in this market structure. *Notice of Proposed Rulemaking and Notice of Inquiry,* 6 F.C.C.R. 3259 (1991) (*"Notice of Proposed Rulemaking"*). The Commission first noted that the bundled special access rate structure was retarding competitive advances by the CAPs because the bundling of the rates means that CAPs pay all the components of the special access charge even if the CAP substitutes its own facilities for one of the LEC transmission segments. In other words, pricing impediments make the services offered by CAPs more expensive than identical services offered by LECs. *Notice of Proposed Rulemaking,* 6 F.C.C.R. at 3260, ¶ 6–10. Second, the Commission found that the public would benefit from increased competition not only in the pricing of similar services but in the development of new services meeting higher technical standards

(such as more efficient transmission equipment). *Id.* at 3261.

The tentative solution to these problems was to require LECs to permit CAPs to connect their facilities to the LEC network through either "physical co-location" or "virtual co-location." *Id.* at 3261–62. In physical co-location, the CAP strings its cable to the LEC central office. The LEC must then turn over space within the central office in which the CAP may install and operate its circuit terminating equipment. In virtual co-location, the LEC owns and maintains the circuit terminating equipment, but the CAP designates the type of equipment that the LEC must use and strings its own cable to a point of interconnection close to the LEC central office.

In the rulemaking proposal the Commission indicated that it would give LECs a choice between physical or virtual co-location, but after receiving comments the Commission made physical co-location mandatory, save in two narrow circumstances. *Report and Order,* 7 F.C.C.R. at 7389–94. Exemptions would be permitted only if (1) an LEC demonstrated that a particular central office lacked physical space to accommodate co-location or (2) a state legislature or public utility commission issued a final decision before February 19, 1993 to allow virtual co-location for intrastate interconnection. *Id.* at 7390–91.

The Commission allowed LECs to impose reasonable terms of access to co-located equipment if those conditions promoted "legitimate concerns" about security in the central offices. *Id.* at 7407 n. 189. The Commission also ordered the LECs to file new, unbundled special access rate tariffs for the various components of special access service; those tariffs allowed LECs to recover the reasonable costs of providing space and equipment to co-locators. *Id.* at 7421–47. The final order altered another aspect of the preexisting rate structure. The Commission, applying its power to modify "unjust and unreasonable" tariffs under § 202(b) of the Communications Act, 47 U.S.C. § 202(b) (1988), found that long-term special access contracts between LECs and customers retarded competition to the extent that those contracts were executed before the new interconnection services became available. *Report and Order,* 7 F.C.C.R. at 7463–65 & n. 468. The Commission therefore ordered LECs to provide existing special access customers with a ninety-day "fresh look" period, during which the customers could abrogate their contracts and switch their business to a CAP. *Id.* at 7464.

The Commission denied petitioners' motion for a stay pending judicial review. *Memorandum Opinion and Order,* 8 F.C.C.R. 123, 123 (1992). After petitions for reconsideration (protesting, among other things, that the original rulemaking proposal had said nothing about the "fresh look" requirement), the Commission issued a *Second Memorandum Opinion and Order on Reconsideration,* 8 F.C.C.R. 7341 (1993) ("*Reconsideration Order*"). There the Commission undertook a de novo examination of the need for the "fresh look" remedy but reaffirmed it, extending the fresh-look period to 180 days. *Id.* at 7353 & n. 48.

II

A

Petitioners contend that the Commission lacks authority under the Communications Act of 1934, 47 U.S.C. § 201 *et seq.* (1988), to require LECS to permit physical co-location of equipment upon demand.[1] The Commis-

---

1. Petitioners' brief, in places, appears to argue that even if the Commission had authority to impose physical co-location we must nonetheless decide whether that imposition inflicted a "taking." In fact we have no power to do so. *Preseault v. ICC,* 494 U.S. 1, 11, 110 S.Ct. 914, 921–22, 108 L.Ed.2d 1 (1990). The Tucker Act, 28 U.S.C. § 1491(a)(1), vests exclusive jurisdiction over takings claims that exceed $10,000 in controversy, as this one obviously does, in the United States Claims Court. *See* 28 U.S.C. § 1346(a)(2) (granting district courts concurrent jurisdiction for takings claims not exceeding $10,000 in amount). If the Commission can show statutory authority for the orders, the petitioners are remitted to a Tucker Act remedy because "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, *duly authorized by law,* when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016, 104 S.Ct. 2862, 2880, 81

sion points to its authority to order carriers "to establish physical connections with other carriers...." 47 U.S.C. § 201(a). Ordinarily *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), would supply the standard for assessment of the claimed authority, but not so here.

 Within the bounds of fair interpretation, statutes will be construed to defeat administrative orders that raise substantial constitutional questions. *Rust v. Sullivan,* 500 U.S. 173, 190–91, 111 S.Ct. 1759, 1771, 114 L.Ed.2d 233 (1991); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Trades Council,* 485 U.S. 568, 575–78, 108 S.Ct. 1392, 1397–99, 99 L.Ed.2d 645 (1988). The Commission's decision to grant CAPs the right to exclusive use of a portion of the petitioners' central offices directly implicates the Just Compensation Clause of the Fifth Amendment, under which a "permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982). Of course the Clause prohibits only uncompensated takings; so long as the Tucker Act provides a subsequent action for redress,[2] generally no constitutional question arises and the judicial policy of avoiding such questions may not be applied. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 127–28, 106 S.Ct. 455, 459–60, 88 L.Ed.2d 419 (1985). But precedent instructs that the policy of avoidance should nonetheless take effect when "there is an identifiable class of cases in which application of a statute will necessarily constitute a taking." *Id.* at 128 n. 5, 106 S.Ct. at 460 n. 5 (distinguishing *United States v. Security Indus. Bank,* 459

U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982)); *see Railway Labor Executives Ass'n v. United States,* 987 F.2d 806, 816 (D.C.Cir. 1993) (per curiam).

Where administrative interpretation of a statute creates such a class, use of a narrowing construction prevents executive encroachment on Congress's exclusive powers to raise revenue, U.S. CONST.ART. I, § 8 ("The Congress shall have Power To lay and collect Taxes"), and to appropriate funds, *id.* § 9 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"). *Cf. Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 631–32, 72 S.Ct. 863, 887–88, 96 L.Ed. 1153 (1952) (Douglas, J., concurring); *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1510, 1522–23 (D.C.Cir.1984) (en banc), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985); *NBH Land Co. v. United States,* 576 F.2d 317, 319 (Ct.Cl.1978) (compensation for unauthorized takings would "strike a blow at the power of the purse.").[3] *Chevron* deference to agency action that creates a broad class of takings claims, compensable in the Court of Claims, would allow agencies to use statutory silence or ambiguity to expose the Treasury to liability both massive and unforeseen.

It is no answer to say that the Tucker Act supplies a remedy only for executive takings that are authorized "expressly or by necessary implication," *Regional Rail Cases,* 419 U.S. at 127 n. 16, 95 S.Ct. at 350 n. 16 (quoting *Hooe v. United States,* 218 U.S. 322, 336, 31 S.Ct. 85, 89, 54 L.Ed. 1055 (1910)), and that therefore no governmental liability would arise from takings inflicted pursuant to ambiguous regulatory statutes. Such a heightened standard of authorization under the Tucker Act would counsel in *favor* of an

L.Ed.2d 815 (1984) (emphasis added). The only question we consider is whether the orders under review were indeed duly authorized by law.

**2.** The Tucker Act remedy is presumed available unless Congress has explicitly foreclosed it by another enactment, *Preseault,* 494 U.S. at 12, 110 S.Ct. at 922, and nothing in the Communications Act does so.

**3.** Because the Commission allowed LECs to file new tariffs under which they will obtain compen-

sation *from the CAPs* for the reasonable costs of co-location, it might be thought that there is no threat to the appropriations power at all. But in fact the LECs would still have a Tucker Act remedy for any difference between the tariffs set by the Commission and the level of compensation mandated by the Fifth Amendment. *See Regional Rail Reorg. Act Cases,* 419 U.S. 102, 125–27, 154–56, 95 S.Ct. 335, 349–50, 364–65, 42 L.Ed.2d 320 (1974).

equally stringent standard in equitable proceedings under the APA; otherwise petitioners would face a strange regime in which clearly unauthorized takings could be set aside under the APA, clearly authorized takings could be recompensed under the Tucker Act, but takings resting on ambiguous authority could not be redressed in either forum. And in any event the Claims Court has so broadly interpreted the "necessary implication" component of the *Regional Rail Cases* standard that any taking authorized in the loose sense of *Chevron* would in fact be compensable. *See, e.g., Southern Cal. Fin. Corp. v. United States,* 225 Ct.Cl. 104, 634 F.2d 521, 523, 525 (Ct.Cl.1980) (implicit authorization encompasses "the good faith implementation of a Congressional Act") (internal quotation omitted).

The Commission's interpretation of § 201(a) creates an "identifiable class" of applications that would seem to constitute a taking. The doctrine established in *Loretto* is cast in the form of a rule. If the statute vests the Commission with power to confer an exclusive right of physical occupation, exercise of the statutory power would seem necessarily to "take" property regardless of the public interests served in a particular case. *Loretto,* 458 U.S. at 426, 102 S.Ct. at 3170–71. The cases rejecting application of the "identifiable class" principle, by contrast, involved agency orders alleged to constitute a regulatory taking under the factually sensitive standards of *Penn Central Transp. Co. v. New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The statutory interpretation adopted by the agency could not be seen to produce a compensable taking in all the cases to which the interpretation would be applied. *Riverside,* 474 U.S. at 127–28 & n. 5, 106 S.Ct. at 459–60 & n. 5; *Railway Labor,* 987 F.2d at 816.

The order of physical co-location, therefore, must fall unless any fair reading of § 201(a) would discern the requisite authority. The Commission's power to order "physical connections," undoubtedly of broad scope, does not supply a clear warrant to grant third parties a license to exclusive physical occupation of a section of the LECs' central offices. Under *either* virtual or phys-

ical co-location the CAP physically connects to the LEC network by a cable that runs to circuit terminating equipment in the LEC office. The difference between the two schemes is a difference in ownership and right of occupancy; under virtual co-location the LEC owns and operates the circuit terminating equipment, whereas under physical co-location the CAP owns the equipment and enjoys a right to occupy a portion of the LEC office in order to maintain the equipment. *Notice of Proposed Rulemaking,* 6 F.C.C.R. at 3262–63. The Commission's decision to mandate physical co-location, therefore, simply amounts to an allocation of property rights quite unrelated to the issue of "physical connection."

Petitioners draw a persuasive contrast with the Interstate Commerce Act (now codified as revised at 49 U.S.C. § 10101 *et seq.*). Congress there directed common transportation carriers to provide "switch connection[s]" for shippers and other carriers. 49 U.S.C. § 11104(a). But Congress also gave the Interstate Commerce Commission power to order carriers to open their "terminal facilities" for the use of other carriers, subject to "compensation for use of the facilities under the principle controlling compensation in condemnation proceedings." *Id.* § 11103(a). Switch connections are to railroads what cable hookups are to telephone companies. The absence of any grant of authority over endpoint facilities in the Communications Act comparable to the "terminal facilities" provision of the ICC Act marks the strained character of the Commission's interpretation of "physical connections."

The Commission argues that even if its takings authority is not express, it can be implied. But such an implication may be made only as a matter of necessity, where "the grant [of authority] itself would be defeated unless [takings] power were implied." *Western Union Tel. Co. v. Pennsylvania R.R.,* 120 F. 362, 373 (C.C.W.D.Pa.), *aff'd,* 123 F. 33 (3d Cir.1903), *aff'd,* 195 U.S. 540, 25 S.Ct. 133, 49 L.Ed. 312 (1904). *Cf. Griggs v. Allegheny County,* 369 U.S. 84, 90, 82 S.Ct. 531, 534, 7 L.Ed.2d 585 (1962). However, the Commission does not even contend that its authority to regulate telecommunications

in the public interest would be seriously hampered, much less defeated, absent takings authority.

■ Applying the strict test of statutory authority made necessary by the constitutional implications of the Commission's action, we hold that the Act does not expressly authorize an order of physical co-location, and thus the Commission may not impose it.

### B

■ Petitioners challenge the virtual co-location requirement solely on the ground that the Commission's justification for the requirement was inadequate. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Our disposition of the physical co-location component of the orders, however, raises a preliminary question of severability. Should the orders leave us with a "substantial doubt" that the Commission would have adopted the virtual co-location requirement standing alone, the two forms of co-location must fall together. *North Carolina v. FERC*, 730 F.2d 790, 796 (D.C.Cir.1984).

On this record doubt hardens into certainty. The Commission allowed virtual co-location in only two narrow circumstances: where physical co-location would prove impossible for lack of space, or where state governments desired virtual co-location for intrastate transmission. *Report and Order*, 7 F.C.C.R. at 7390–91. Cast as an exception to a general rule, virtual co-location cannot with any coherence be thought to survive our abrogation of the rule itself. We will remand the orders for further proceedings in which the Commission may consider whether and to what extent virtual co-location should be imposed.[4]

### C

Petitioners' final challenge is that the "fresh look" requirement was adopted in violation of the notice-and-comment provisions of the APA. *See* 5 U.S.C. § 553 (1988). In both its initial and final forms, the period within which customers would be allowed to terminate their service was to begin from the date that the first co-location arrangement became "operational" in the central office of a given LEC. *Report and Order*, 7 F.C.C.R. at 7464; *Second Reconsideration Order*, 8 F.C.C.R. at 7352. Although the temporary right to switch providers may have been intended as an independent regulatory remedy for the problems of rate structure and barriers to competition that the Commission identified, the remedy was tied to the details of co-location and would float unattached in their absence. We must therefore remand that portion as well.

### III

The petitions for review are granted. The orders are vacated insofar as they require physical co-location; in all other respects the orders are remanded to the Commission for further proceedings.

*It is so ordered.*

---

4. The remand makes it unnecessary to consider other arguments against the virtual co-location scheme advanced by the National Association of Regulatory Utility Commissioners and the Pennsylvania Public Utility Commission, intervenors in the present case.