**GTE SOUTHWEST INCORPORATED, Appellant,**

v.

**PUBLIC UTILITY COMMISSION OF TEXAS; GE Capital Rescom; and MultiTechnology Services, L.P., Appellees.**

No. 03–97–00148–CV.

Court of Appeals of Texas, Austin.

July 15, 1999.

Rehearing Granted in Part and Overruled in Part Feb. 17, 2000.

---

**9**

John F. Williams, Clark, Thomas & Winters, P.C., Austin, for Appellant.

Myra A. McDaniel, Bickerstaff, Heath, Smiley, Pollan Kever & McDaniel, L.L.P., Mary A. Keeney, Assistant Attorney General, Austin, for Appellee.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and POWERS.[*]

JOHN E. POWERS, Justice (Retired).

GTE Southwest Incorporated ("GTE") sued the Public Utility Commission for judicial review of a final order issued by the Commission in a contested case. Capital Rescom and Multi–Technology Services, L.P. ("MTS") intervened in the suit to defend the order.[1] GTE appeals now from a trial-court judgment that affirms the order. We will reverse the order and the trial-court judgment, and remand the controversy to the Commission.

---

[*] Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. In our discussion hereafter, we will, where appropriate, refer collectively to the Commission, Rescom, and Multi–Technology Services, L.P., as "appellees."

2. GTE appears to have no regular policy or practice of selling or allowing others to use its installed cables, and the company's tariff on file at the Commission makes no provision in that regard beyond requiring that any demar-

## THE CONTROVERSY

GTE installed and owns the cables and equipment necessary to supply local-exchange telephone service to five large apartment complexes in League City, Dallas, and Irving. By agreement with the owners of the apartment complexes, GTE installed its cables up to each apartment building, that being the mutually agreed "demarcation point" where GTE's cables would connect to the owner's wiring and equipment.

Rescom and MTS are in the business of providing "shared tenant services" to such apartment buildings and other large, multi-unit premises. Shared-tenant services include climate-control and video transmissions in addition to local-exchange and long-distance voice and data transmission services. Rescom and MTS proposed to GTE that it "collapse" its multiple demarcation points (one at each building in each of the five complexes) into a single demarcation point at each complex, located as near as practicable to the property line of the complex. *See* 47 C.F.R. § 68.3 (1996). Rescom and MTS would then purchase GTE's installed cable and equipment lying between the buildings of the complex and the new, single demarcation points, or they would pay a rental or fee for their use of that segment of GTE's property and equipment.[2] GTE agreed to the proposal at one apartment complex, and sold its cable and equipment lying on the "owner's side" of the new, single demarcation point located at the property line of that complex. Negotiations were unsuccessful respecting the five apartment complexes

cation point be located by agreement with the property owner and that it be consistent with "Part 68 of the FCC Rules and Regulations." As noted in footnote 3, *infra,* these require that the demarcation point be located near the property line or near where the cable enters a multiple-unit building or buildings. GTE's installation at the five complexes was consistent with the first location; the new demarcation proposed by Rescom and MTS would have been consistent with the second authorized location.

presently in controversy. GTE offered, however, to provide an *additional* demarcation point at the property line of each of those complexes—a demarcation point from which Rescom and MTS could install their own cable network to buildings within each of the five apartment complexes. Rescom and MTS declined GTE's offer on the ground that their installation of an additional cable network within the five complexes would be unnecessary, inefficient, disruptive, and too expensive.

Acting as agents for the owners of the apartment complexes, Rescom and MTS complained to the Commission that GTE had violated its tariff and GTE's "internal guidelines" by refusing to "collapse" its multiple demarcation points into a single such point; and they complained that GTE had applied its demarcation practices unreasonably and in an anti-competitive manner. After a contested-case hearing, the Commission issued a final order adjudicating the case. In its order, the Commission concluded that GTE's "untariffed practice" regarding demarcation points at multi-unit premises contravened the reasonableness and non-discrimination requirements of certain federal [3] and state [4] regulations.

The Commission therefore directed in its final order that GTE file in another Commission proceeding a proposed revision of its tariff pertaining to shared-ten-

ant services, requiring that the revised tariff "include a reasonable and non-discriminatory practice addressing the relocation of multiple demarcation points to a single point of demarcation on multi-unit premises." In addition, the Commission required that the revised tariff include "a reasonable and non-discriminatory practice with respect to (1) the permitted use of cable and other facilities on the ... owner's side of the single demarcation point after multiple points are collapsed and (2) the appropriate compensation for such use of cable and other facilities (e.g., lease or purchase)."

The order thus requires GTE to revise its tariff to include therein reasonable provisions under which GTE will collapse its multiple demarcation points into a single demarcation point at multi-unit premises; and the revised tariff *must allow the owner of the premises to lease, purchase, or otherwise obtain the use of GTE's cables and facilities, on the "owner's side" of the new, single demarcation point, for an "appropriate compensation."* The emphasized language of the order gives rise to the first issue on appeal—whether the Commission possessed the statutory power to issue such an order.

## DISCUSSION AND HOLDINGS

In its first assignment of error, GTE complains that the Commission acted with-

3. The federal regulation provides that a telephone company "may establish a reasonable and nondiscriminatory practice of placing the demarcation point" at either of two places: the nearest practicable point to where the company's wiring crosses a property line; or, where the wiring enters a multi-unit building or buildings. *See* 47 C.F.R. § 68.3(b)(2) (1996).

4. The state requirements were contained in the Public Utility Regulatory Act of 1995. *See* Tex.Rev.Civ. Stat. Ann. art. 1446–o ("PURA 1995"). The Act has been repealed and recodified without substantial change. *See* Tex. Util.Code Ann. Title 2 (West 1998) ("PURA 1997"); *see also* Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 713–1018. PURA 1995 prohibited a utility's "making or granting any unreasonable preference or advantage to any corporation or

person within any classification," or subjecting such corporation or person to "any unreasonable prejudice or disadvantage." PURA 1995, § 3.215. PURA 1995 also provided that a public utility "may not discriminate against any person or corporation that sells or leases equipment or performs services in competition with the public utility," and may not engage "in any other practice that tends to restrict or impair competition." PURA 1995, § 3.217. These provisions are now found in PURA 1997 sections 55.005 and 55.006.

It appears to be undisputed that GTE, on the one hand, and Rescom and MTS, on the other hand, compete in the shared-tenant services market. It also appears to be undisputed that GTE and the owners of the five complexes—the principals represented by Rescom and MTS—are *not* in competition in that market.

out statutory authority in requiring that GTE revise its tariff to allow for the surrender of its property for use by the property owners. We sustain the assignment of error. *See* Tex. Gov't Code Ann. § 2001.174(2)(B) (West 1999) (reviewing court shall reverse or remand case for further proceedings if substantial rights of complaining party prejudiced because agency decision "in excess of agency's statutory authority").

The Takings Clause of the Fifth Amendment to the Constitution of the United States provides that "private property [shall not] be taken for public use without just compensation." The clause applies to state-government action through the Due Process Clause of the Fourteenth Amendment to the Constitution. *See Chicago Burlington & Quincy R.R. v. Chicago,* 166 U.S. 226, 234–41, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

▄▄▄ The Takings Clause consists of several elements, any one of which may be the subject of litigation: (1) the action complained of must be that of the government; (2) the action must amount to a taking; (3) the thing taken must be "private property," that is to say it must be one of the rights included in the owner's "bundle" of rights in property; and (4) the taking must be for a "public" use. *See* Matthew D. Zinn, *Ultra Vires Takings,* 97 Mich. L.Rev. 245, 248–49 (1998). It is undisputed that GTE owns the property in question. We need refer in the present case to the second element only—whether the Commission order amounted to a taking of GTE's property—before we consider whether the order was ultra vires.

▄▄▄ Government may supervise and control private property quite extensively, in the public interest, without effectuating thereby a taking of the property. *See generally Yee v. City of Escondido,* 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922 (Tex.1998); *Annotation: Supreme Court's Views as to What Consti-* tutes "Taking" of Private Property for Public Use Without Compensation, 89 L.Ed.2d 977 (1997). Nevertheless, government action can go "too far" so that it amounts to a taking of private property. This occurs, for example, when government (1) physically takes the property by compelling the property owner to surrender his right to exclude others from physical use of the property, *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); (2) deprives the owner of all "economically beneficial or productive use" of his property so that the government action is tantamount to a physical taking, *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); or (3) regulates property to such an extent that the reviewing court concludes that the regulation is tantamount to a physical taking based upon the court's "essentially ad hoc, factual inquiry" concerning the "character" of the governmental action, its economic impact on the property owner, and its interference with "distinct investment-backed expectations." *See Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). We need not inquire as to categories two and three. We conclude the Commission's order amounts to a physical or per se taking of GTE's cables and facilities by requiring that GTE surrender its right to exclude others from physical use of its properties. *See Loretto,* 458 U.S. at 426, 102 S.Ct. 3164 (statute prohibiting owner of rental property from interfering with installation of cable-television facilities on her property); *Bell Atl. Tel. Cos. v. F.C.C.,* 24 F.3d 1441, 1446 (D.C.Cir.1994) (F.C.C. order compelling public utility to make its facilities available for use by others for reasonable compensation); *Gulf Power Co. v. United States,* 998 F.Supp. 1386, 1395 (N.D.Fla.1998) (statute requiring public utility to provide others nondiscriminatory access to utility's poles, ducts, conduits, and rights-of-way); *cf. F.C.C. v. Florida Power Corp.,* 480 U.S. 245, 253–54, 107

S.Ct. 1107, 94 L.Ed.2d 282 (1987) (compelled acquiescence lies at "heart of the concept of occupation" and "[t]he line which separates [*Florida Power*] from *Loretto* is the unambiguous distinction between a commercial lessee," occupying property with owner's consent, "and an interloper with a governmental license."). We turn then to whether the Commission possessed the statutory power to issue an order taking GTE's property in the sense and on the terms indicated above.

■ It is axiomatic that the Commission has no inherent power, but only such powers as are delegated to it by the legislature in clear and *express* statutory language, together with any implied power that may be necessary for the Commission to perform a function or duty that the legislature has required of the agency in *express* terms. *See Key W. Life Ins. Co. v. State Bd. of Ins.*, 163 Tex. 11, 350 S.W.2d 839, 848 (1961); *Coastal States Prod. Co. v. Pate*, 158 Tex. 171, 309 S.W.2d 828, 831 (1958); *Sexton v. Mt. Olivet Cem. Ass'n*, 720 S.W.2d 129, 137 (Tex.App.—Austin 1986, writ ref'd n.r.e.).

Appellees have referred us to no statute that expressly authorizes the Commission to compel a regulated utility to allow others to physically occupy property that the utility has devoted to public use, and no statute that expressly requires that the agency perform a duty or function that necessitates such a power. We should say, in this connection, that the issue is not whether the Commission possesses a general power to take private property, but whether the particular action claimed to be a taking in this case is authorized by statute. *See Zinn, supra,* at 246.

Appellees point instead to statutes that give the Commission general and broadly stated powers to regulate and supervise public utilities and to perform quite general duties and functions.[5] These delegated powers and duties are obvious and admitted but they do not *expressly* confer upon the Commission a power to compel a regulated utility to surrender its property for physical occupation by others. *See Bell Atl. Tel. Co.,* 24 F.3d at 1446 (statutory power of F.C.C. to order "physical connections," while of broad scope, "does not supply a clear warrant to grant third parties a license to physical occupation of" utility's property.).

■ May the power claimed by the Commission be implied on the ground of necessity from the general powers and duties relied upon by the agency—the power to secure equal opportunity for all telecommunication utilities in a competitive marketplace and the agency's duty to carry out the legislative policy of promoting a diversity of providers and interconnectivity while encouraging a fully competitive marketplace in the telecommunications field? We may not make such an implication unless these grants of regulatory authority will themselves be *defeated* absent an attendant authority to require a public utility to submit to physical occupation of its property by others. *See Western Union Tel. Co. v. Pennsylvania R.R.,* 120 F. 362 (C.C.W.D.Pa.), *aff'd,* 123 F. 33 (3d Cir. 1903), *aff'd,* 195 U.S. 540, 25 S.Ct. 133, 49 L.Ed. 312 (1904). The Commission does not contend that is the case. The Commission insists instead that its order does not constitute a taking at all. Moreover, familiar rules of statutory construction reject the implication. Statutory grants of power to administrative agencies must be construed narrowly when they are claimed to authorize governmental interference with established or traditional property

---

5. The Commission refers to its "general power to regulate and supervise the business of each public utility ... and to do anything specifically designated or implied by this title that is necessary and convenient to the exercise of that power and jurisdiction," PURA 1997, § 14.001; the agency's duty to "promote diversity of telecommunications providers and interconnectivity" and to "encourage a fully competitive telecommunications marketplace,"*Id.* § 51.001; and its duty to "provide equal opportunity to each telecommunications utility in a competitive marketplace," *Id.* § 52.001.

rights. *See 3 Sutherland Statutory Construction,* § 65.02 at 312 (1992). This is particularly true when the power claimed to be implied necessarily raises, as it does here, substantial constitutional questions regarding just compensation and public use. *See Rust v. Sullivan,* 500 U.S. 173, 190–91, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

■ The Commission contends that GTE's complaint of a taking is "premature" because the agency order merely requires that GTE revise its tariff. We construe the contention to be an invocation of the "ripeness" doctrine. The Commission obviously intended that its order be a final order adjudicating the case now before us, and the Commission did not challenge the trial court's subject-matter jurisdiction on the ground that the order was not final. The Commission does not suggest why the taking issue is not presently fit for judicial review, nor why GTE must suffer the interim oppression of a tariff-revision proceeding of the kind required by the Commission's final order. We reject the contention. *See Browning–Ferris, Inc. v. Brazoria County,* 742 S.W.2d 43, 48–49 (Tex.App.—Austin 1987, writ ref'd).

■ The Commission appears to contend that its final order does not constitute a taking in the *Loretto* sense because the order also directs that GTE revise its tariff to provide for the recovery of "appropriate compensation"; and, if we understand correctly the Commission's position, it purports to distinguish *Loretto* on that basis. We should point out that the statute considered by the court in *Loretto* expressly provided for an agency calculation and award of just compensation. There is thus no such distinction. And, if the Commission lacks the statutory power to take a utility's property, there is of course no reason for the payment of compensation.

Further, no statute administered by the Commission delegates to the agency a power to measure, calculate, and award just compensation for a taking or instructs the agency how to proceed in such a case. This statutory silence indicates, if nothing else does, that the legislature never intended the Commission to have a power to take a utility's property in the course of the agency's exercise of its extensive powers of regulation and supervision of a utility's property. *Cf. Gulf Power Co.,* 998 F.Supp. at 1395–98 (holding constitutional federal statute conferring upon F.C.C. express power to require electric-power utility to make its properties available to cable company, and express power to determine just and reasonable rates therefor). We reject the Commission's argument.[6]

Appellees contend finally that the Commission's order amounts not to a taking in the *Loretto* sense, but only to permissible regulation under the "essentially ad hoc factual inquiries" required by the *Penn Central* decision. *See Penn Cent.,* 438 U.S. at 123–24, 98 S.Ct. 2646. We disagree. We have pointed out above the distinction between a per se or physical taking under *Loretto*—a government-compelled deprivation of a property owner's right to exclude others from the physical occupation of his property—and other forms of taking short of actual physical appropriation. *See Loretto,* 458 U.S. at 427–28, 102 S.Ct. 3164. Because we find here a taking in the *Loretto* sense, we need not inquire whether there is a taking in the *Penn Central* sense.

In two assignments of error, GTE contends the Commission erroneously determined that F.C.C. rules and precedents authorized the agency to force GTE to turn over its cables to others, and that such rules and precedents, properly interpreted, did not so provide and preempt

---

6. Although the Commission's final order directs GTE to file a tariff providing for an "appropriate" compensation to be obtained from the apartment complex owners, or presumably others acting under such owners,

GTE would still be entitled to a determination of whether the amount approved by the Commission as "appropriate" amounted to the "just compensation" required by the Fifth Amendment.

any state rules and statutes under which the Commission acted to the contrary. We need not discuss these contentions because of our holding that the Commission's order constituted an ultra vires taking per se under *Loretto*. Any FCC regulation and precedents must yield to the Fifth Amendment as interpreted in *Loretto*.

■ In a fourth assignment of error, GTE contends the Commission erred in concluding that GTE's conduct in the matter of demarcation points was unreasonable and discriminatory. We agree with GTE's contention that it cannot be charged with discrimination or unreasonableness merely because it refuses to surrender to others, by agreement, the use or occupation of its property. The record indicates, however, that the issues of discrimination and unreasonable conduct perhaps involved other factors pertaining to GTE's demarcation-point practices—factors that the Commission may wish to reconsider in light of our holding that the agency was powerless to remedy any unreasonable conduct or discrimination by compelling GTE to acquiesce in the physical occupation of its property by others. To afford the Commission an opportunity to reconsider, we will remand the cause to the agency.

We reverse the Commission order and the trial-court judgment, and remand the controversy to the Commission for further proceedings not inconsistent with our opinion.

BEA ANN SMITH, Justice, dissenting.

The dissenting opinion issued by this Court July 15, 1999 is withdrawn and the following is substituted in its place. Technological leaps have altered telecommunication markets and prompted changes in governmental regulatory policies. Instead of regulating monopolies granted to a few companies, the Public Utility Commission is now charged with promoting competition among diverse service providers. Implementing this new charge, the Commission ordered GTE to revise its tariff to ensure

reasonable, nondiscriminatory bases for decisions affecting access to customers by alternate service providers. The majority concludes that the Commission has overreached. Because the majority ignores the Commission's new responsibility and powers, I respectfully dissent.

## DISCUSSION

I believe that the Commission has the power and duty to make this order, that the federal regulation requires GTE to relocate demarcation points when the owner requests, and that any taking is statutorily and constitutionally permissible. I would overrule GTE's points of error.

### The Power to Order Tariff Revisions under the Utilities Code

The majority concludes that the Commission lacks the power to require GTE to revise its tariff to establish a procedure for considering whether to collapse multiple demarcation points to a single point. I believe that the changes wrought in the Utilities Code by the Public Utility Regulatory Act of 1995 empowers and virtually compels the Commission to make the disputed order.

The legislature placed an imposing duty on the Commission, but granted it concordantly broad and flexible powers. The Utilities Code directs the Commission to promote diversity of telecommunications providers and interconnectivity and to encourage a fully competitive telecommunications marketplace. Tex. Util.Code Ann. § 51.001(a) (West Supp.2000). The legislature recognized that telecommunications is an industry "that does not lend itself to traditional public utility regulatory rules, policies, and principles." *Id.* § 52.001(b) (West 1998). The Commission therefore must develop rules, policies, and principles to protect the public interest and "provide equal opportunity to each telecommunications utility in a competitive marketplace." *Id.* The legislature also wrote that

[T]he strength of competitive forces varies widely between markets, products,

and services. It is the policy of this state to require the commission to take action necessary to enhance competition by adjusting regulation to match the degree of competition in the marketplace to:

(1) reduce the cost and burden of regulation; and

(2) protect markets that are not competitive.

*Id.* § 51.001(e) (West Supp.2000). The Commission also "has the general power to regulate and supervise the business of each public utility within its jurisdiction and to do anything specifically designated *or implied* by this title that is necessary and convenient to the exercise of that power and jurisdiction." *Id.* § 14.001 (West 1998) (emphasis added).

In addition to these general policy statements and conferrals of broad powers, several specific statutes indicate the Commission can require GTE to revise its tariff to establish a procedure for collapsing multiple demarcation points to a single point. The Commission must ensure that public utilities charge and receive just and reasonable rates. Tex. Util.Code Ann. § 53.003(a). The Commission can order the revision of unreasonable rates. *Id.* § 53.151. The definition of "rate" includes tariffs. *Id.* § 11.003(16) (West Supp.2000). The public utilities the Commission governs may neither grant an unreasonable preference or advantage to a person in a classification nor subject a person in the classification to an unreasonable prejudice or disadvantage. *Id.* §§ 53.003(c) & 55.005 (West 1998). Nor can public utilities engage in a practice that tends to restrict or impair competition. *Id.* § 55.006. The Commission can also adopt just and reasonable standards, rules, or practices a public utility must follow in furnishing a service. *Id.* § 55.002.

GTE's actions justify the Commission's use of its authority to require that GTE have a procedure regarding relocation of the demarcation points. A single demarcation point near the property line enhances competition because competitors can offer alternative service to the property owner at a more competitive rate only by using the existing cable starting at the property line, rather than duplicating the capital expenditure of laying their own cable. GTE has no set policy regarding relocation of demarcation points. As a result, it consented to relocation on one property, then refused to relocate on others, with no distinction evident except a change in decision-makers. Thus, the customers in one apartment complex got access to competitive alternate service providers, but those in the other complexes remain essentially isolated from the market. Uncertainty inhibits competition, but the outright refusal to relocate squelches it by increasing the costs to competitors of reaching new customers. The Commission could not ignore the legislature's clear directive that it eliminate unreasonable discrimination and enhance competition.

### The Federal Regulation Requires Revision of GTE's Tariff

In issuing its order, the Commission found that GTE's untariffed practice violates 47 C.F.R. § 68.3. The Commission argues that GTE's tariff expressly incorporates FCC's regulations governing demarcation points.[1] By violating an FCC rule expressly incorporated into its tariff, GTE failed to comply with its own tariff, the Commission urges. In issuing its order the Commission did no more than exercise its authority to require GTE to comply with its own tariff.

I would hold that this FCC regulation supplies additional authority for the Commission's order requiring GTE to file a

---

1. The Commission relies on the following language found in a section entitled "Obligation of the Telephone Company:" "The Telephone Company shall terminate its Network Access Facilities at a mutually agreeable point of demarcation...in a manner no different than that provided under Part 68 of the FCC Rules and Regulations." See Second Revised Sheet No. 5 of GTE's tariff.

revised STS tariff. The majority summarily dismissed this ground, holding that any FCC regulation and its precedents must yield to the Fifth Amendment. First we examine the regulation, which provides in pertinent part:

> In multiunit premises in which wiring is installed after August 13, 1990, including additions, modifications and rearrangements of wiring existing prior to that date, the telephone company may establish a reasonable and nondiscriminatory practice of placing the demarcation point at the minimum point of entry. If the telephone company does not elect to establish a practice of placing the demarcation point at the minimum point of entry, the multiunit premises owner shall determine the location of the demarcation point or points. The multiunit premises owner shall determine whether there shall be a single demarcation point location for all customers or separate such locations for each customer.

47 C.F.R. § 68.3 (definition of demarcation point, subpart (b)(2)).[2] While this regulation does not expressly address "relocation" of demarcation points, it does address "modifications and rearrangements" of prior wiring. The FCC itself has held that an owner's request to move the demarcation point would constitute a modification or rearrangement. *See In the Matter of Review of Sections 68.102 and 68.213 of the Commission's Rules Concerning Connections of Simple Inside Wiring to the Telephone Network,* CC Docket No. 88–57, ¶ 26 n.104 (June 17, 1997). I would hold that a request to move the demarcation point constitutes a modification or rearrangement covered by Section 68.3. This being true, I would hold that Section 68.3 requires GTE to consider relocating its demarcation points in a reasonable and nondiscriminatory manner when the owner of a multiunit premises so requests.

The minimum point of entry is defined in Section 68.3 as (1) the closest practicable point to where the wiring crosses a property line or (2) the closest practicable point to where the wiring enters a multiunit building or buildings. Which of these alternatives defines the minimum point of entry is to be determined **by the telephone company's reasonable and nondiscriminatory standard operating practices.** *See* 47 C.F.R. § 68.3. Thus, if the telephone company's "reasonable and nondiscriminatory standard operating practice" dictates that maintaining multiple demarcation points is no longer feasible, then the minimum point of entry should be relocated to where the wiring crosses a property line. What is reasonable may change as technology advances and public policy changes. What was reasonable in a highly regulated market may no longer be reasonable in a highly competitive market.

In the absence of a reasonable and nondiscriminatory procedure for considering relocation requests, section 68.3 empowers the premises owner to determine the location of the demarcation point or points. *See* 47 C.F.R. § 68.3. The owner (or here the owner's agents, the STS providers) thus may require the procedureless telephone company to relocate its demarcation points to the owner's desired minimum point of entry. The inclusion of this provision would be meaningless if an agency such as the Commission could not require a telephone company to maintain reasonable and nondiscriminatory practices and policies for determining its minimum point of entry.

The majority decision allows GTE to ignore the requirement of having reasonable and nondiscriminatory standard operating procedures. This Court should hold that the Commission correctly determined that GTE's arbitrary decision to relocate demarcation points at one property but not another, together with its lack of any written relocation policy, violated Section 68.3.

**2.** This definition of demarcation point has been amended to delete the word "modifica-

tions" from the first sentence. *See* 47 C.F.R. § 68.3 (1999).

The FCC regulation supports the Commission's order requiring GTE to adopt a revised tariff that sets forth reasonable, nondiscriminatory, standard practices governing relocation of demarcation points.

The majority also errs by saying the FCC rule must yield to the Fifth Amendment. There is no taking issue. The Commission's order does not mandate a forced turnover of GTE's equipment to its competitors, but requires a revised STS tariff in which GTE shall set appropriate compensation for any equipment that its competitors use. Further, as a state intermediate appellate court, we may not declare invalid or ultra vires a federal regulation that is made applicable to specific telecommunications decisions governed by our public utility commission. *See South Cent. Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n*, 744 F.2d 1107, 1114 (5th Cir. 1984), *cert. granted, judgment vacated*, 476 U.S. 1166, 106 S.Ct. 2884, 90 L.Ed.2d 972 (1986), *on remand*, 798 F.2d 129 (5th Cir. 1986).

### The Taking, if any, is Permissible.

The majority concludes that the Commission has taken GTE's property. I question whether a taking has occurred, in part because of the nature of GTE's property interest in the cable and in part because of the nature of the order. I also conclude that the order allows adequate compensation if any taking occurs.

GTE's property interest in the cables is limited. It owns the cables because, as the local exchange company, it laid them in the passing era of local telephone service monopolies. The cables are not main local exchange lines, but cables that traverse the landowners' property to connect apartment buildings to the main line. GTE does not claim that it could exclude the competitors from using the cable on the landowners' side of the multiple demarcation points, nor does it propose that it could exclude the competitors from connecting to the local exchange main lines located adjacent to the property. GTE does not claim the right to exclude others

from the land surrounding its cables; in fact, it invites competitors to lay their own cables across the land to connect to the local exchange main lines—a prospect of dust and destruction that the property owners dislike. It claims exclusionary rights only to the stretch of cable traversing the building owners' land between the demarcation points for each building to the edge of the property.

The majority's opinion appears premature because the Commission neither orders the transfer of cable nor requires that GTE surrender the right to exclude others from the use of its cable. The Commission's order requires GTE to reformulate its tariff to govern GTE's decisions on the relocation of demarcation points in a reasonable and nondiscriminatory manner. GTE may formulate its tariff in a way that allows it to refuse to relocate demarcation points in a reasonable and nondiscriminatory manner; the reformulation of its tariff, then, would not deprive GTE of anything. Only when the required reformulation causes the surrender of cable, its right to exclude others from that cable, or some other property right, will there be a taking. Until GTE completes the "interim oppression of a tariff-revision proceeding" (as described by the majority) we cannot know whether the tariff revision will cause a taking of GTE's property.

Because the tariff presumably will require GTE to allow relocation of the demarcation point under certain circumstances as yet unknown, I will examine whether such a taking is permissible. As discussed above, the Commission has the statutory authority and responsibility to alter tariffs that unreasonably inhibit competition. There is substantial evidence to support the conclusion that denying competitors access to the existing cable unreasonably inhibits their ability to compete by imposing unreasonably large costs on them. Evidence also supports the conclusion that the laying of duplicative cable will impose the unnecessary externalities of

disruption and destruction of landscape on the residents of the complexes.

The Commission is within its statutory and constitutional limits to order this taking. As discussed above, the new Utilities Code compels the removal of unreasonable impediments to competition. Evidence supports the conclusion that the denial of access to the existing cable was unreasonable and discriminatory when compared with the allowance of access at a similar complex. Evidence also supports the conclusion that GTE should be allowed to recoup its investment in laying the existing cable; the rearrangement fee provides the compensation to make any taking statutorily and constitutionally acceptable.[3] The statutes that compel access for competitors also require that existing carriers not be unfairly treated. *See* Tex. Util.Code Ann. §§ 52.001, 52.054(a)(2). The federal and state constitutions allow the government to take private property so long as the owner is compensated for its loss. U.S. Const. amend. V ("private property [shall not] be taken for public use *without just compensation.*"); Tex. Const. art. I., § 17 ("No person's property shall be taken, damaged or destroyed for or applied to public use *without adequate compensation being made ....*") (emphases added). The Commission's order lets GTE charge a rearrangement fee necessary to move the demarcation points. GTE can assess its own expenses in formulating that rate. The Commission clearly has the authority to evaluate the reasonableness of rates charged. *See* Tex. Util.Code Ann. § 53.003(a). Should the Commission's assessment of GTE's valuation leave GTE unsatisfied, GTE has recourse to judicial review. *Id.* § 15.001; *cf. Gulf Power Co. v. United States,* 998 F.Supp. 1386, 1397–98 (N.D.Fla.1998).

In *Gulf Power,* a case on which the majority relies to show the Commission's order is a taking, the district court determined that an access fee could adequately compensate for a taking. *See id.* A federal law required utility pole owners to allow other utilities to attach wires to their poles. The pole owners could charge a fee, reviewed by the Federal Communications Commission, to compensate for the taking. *See id.* The district court held that FCC review of the fairness of the fee was constitutional and might be better than original judicial review because of the FCC's expertise in rate-setting. *Id.* at 1397–98. The district court also barred pole owners from filing suit until the FCC set a rate too low to compensate for the intrusion of the wires on their poles. *Id.* at 1397.

The Supreme Court has envisioned that a state-authorized taking by a utility may be compensated adequately to satisfy the constitution. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 441, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). The Supreme Court held that a cable television company's state-approved installations on an apartment building roof were a taking of the building owner's property. *Id.* at 424. The Court reversed the New York Court of Appeals' decision that this was not a taking, but remanded the issue of whether the one-time, one-dollar fee was sufficient compensation to ameliorate the taking. *Id.* at 441.

The rejection of a federal regulation requiring local exchange carriers ("LECs") to set aside portions of their building for their competitors' equipment does not require rejection of the Texas Commission's order. *See Bell Atl. Tel. Cos. v. Federal Communications Comm'n,* 24 F.3d 1441 (D.C.Cir.1994). The federal regulation required LECs to accept "physical co-location" of competitors' equipment. *Id.* at 1443. If physical co-location was impossible, the FCC required the LECs to allow virtual co-location; that is, the competitors could designate the type of equipment the

---

**3.** The majority does not discuss this fee because it concludes the Commission lacks the power to take property.

LECs used in their buildings to service the competitors' customers. *Id.* The appellate court ruled that mandatory physical co-location was a taking; the court did not decide the nature of virtual co-location. *Id.* at 1445. The court held the taking unconstitutional, not because the FCC's compensation scheme was inadequate, but because the FCC was not constitutionally or statutorily authorized to appropriate funds to supply the compensation; the court held that an administrative taking not explicitly authorized by Congress was an unconstitutional drain on the Treasury. *Id.* The federal constitution's limitations on federal agencies, however, do not constrain state agencies. Even if they did, or a provision in the state constitution offered a similar obstacle, the Commission's ruling here allows for compensation for the taking through rearrangement fees charged to the property owners, customers, or competitors, none of which will drain the State treasury.

### GTE's points of error fail.

The Commission's proper exercise of its responsibilities and powers in issuing this order requires the overrule of GTE's points of error and affirmance of the district court's affirmance of the Commission's order. GTE contends that the Commission erred by finding that it acted unreasonably and discriminatorily. GTE also argues the district court's affirmance was error because the Commission lacks the authority to take GTE's property for the use and benefit of its competitors. GTE further contends that the Commission erroneously determined that FCC rules and precedent required or authorized it to force GTE to turn over its network cable to the competitors; instead, GTE contends, federal law preempts the Commission's action.

State law and the evidence support the Commission's order. Substantial evidence supports the conclusion that lack of a set procedure in GTE's tariff for determining whether to relocate a demarcation point led to inconsistency and unreasonableness in GTE's relocation decisions.[4] The Code provisions enacted in 1995 require the Commission to prevent such unreasonable interferences with customers' access to competitive services; the Commission's order eliminates the interference, but balances the costs by allowing the rearrangement fee. The Commission's pre–1995 refusals to take property are irrelevant to whether the 1995 Act gives it the power and responsibility to order GTE to reformulate its tariff concerning the relocation of demarcation points. Furthermore, the Commission was authorized to require GTE to comply with FCC rules and regulations expressly incorporated into its tariff.

Federal law does not require reversal of the Commission's order. The Utilities Code empowers the Commission to make the order as do FCC regulations and pronouncements. GTE's argument that the FCC preempted the Commission's power also fails. GTE cites the FCC's conclusion that states can regulate "inside wire" not inconsistently with FCC technical standards. The applicability of this conclusion is dubious because GTE argues that the cables in question are network cable, not inside wire. Further, there is no showing that the Commission's order is inconsistent with the FCC's technical standards. Finally, though GTE argues that the FCC has not interpreted its regulations "to provide for mandatory customer access to network cable serving multiple customers," GTE does not show that the FCC prohibits states from doing so. I would overrule all four points of error and affirm the

---

4. I also note that the findings of discrimination and unreasonableness support, but are not necessary to, the Commission's order. Even if the Commission erroneously found GTE acted discriminatorily or unreasonably, the relief granted in the Commission's order is prospective and intended to forestall future discrimination and unfairness. *See* Tex. Util. Code Ann. §§ 55.002–.003. It can stand on that basis without the findings of discrimination and unreasonableness.

district court's judgment and the Commission's order.

## CONCLUSION

Because I believe that the Commission has not taken anything from GTE and has provided a means of compensation for any taking that might occur under a revised tariff, I would affirm the district court judgment affirming the Commission's order.